Not Reported in F.Supp.2d                                                                                              Page 1
Not Reported in F.Supp.2d, 2002 WL 34099815 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

▶

Dagher v. Saudi Refining, Inc.
C.D.Cal.,2002.
Only the Westlaw citation is currently available.
United States District Court,C.D. California.
Fouad N. DAGHER, et al., Plaintiffs,
v.
SAUDI REFINING, INC., et al. Defendants.
No. CV 99-6114-GHK(JWJX).

Aug. 13, 2002.

Daniel R. Shulman, David M. Sullivan, Shulman Law Offices, Minneapolis, MN, John H. Boone, John H. Boone Law Offices, Joseph M. Alioto, Alioto Law Firm, San Francisco, CA, Thomas P. Bleau, Bleau Fox & Fong, Los Angeles, CA, for Plaintiffs.
Brian Arnold, Kirkland & Ellis, Bryan A. Merryman, White & Case, Thomas J. Nolan, Skadden ArpsSlate Meagher and Flom, Bradley S. Phillips, Ronald L. Olson, Stuart N. Senator, William D. Temko, Munger Tolles & Olson, Dale J. Giali, Howrey, Los Angeles, CA, Michael Shuster, White & Case, New York, NY, Alan M. Grimaldi, Eric J. McCarthy, Kristen S. Scammon, Patricia G. Butler, Victor J. Miller, William R. O'Brien, Howrey Simon Arnold & White, Washington, DC, for Defendants.

MEMORANDUM AND ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT (PART TWO: Re: § 1 PER SE & QUICK-LOOK LIABILITY)
KING, J.

I. Introduction

*1 This matter is before the court on the parties' cross-motions for summary judgment. The motions came on regularly for hearing on December 10, 2001. On May 21, 2002, we issued an order with respect to Plaintiffs' standing against SRI. We hereby adopt Sections II (Procedural History), III (Undisputed Facts), IV (Summary Judgment), and V.A (Antitrust Conspiracy Cases) of that May 21, 2002 order. We now rule on the remaining issues after considering the joint briefs, all pertinent papers, the evidence, and oral argument:

II. Per se and/or Quick-Look Antitrust Liability

The parties divide per se and/or quick-look liability into two subissues: (1) "Are Equilon and Motiva integrated such that SRI, Shell and Texaco are not subject to per se or "quick look" liability?"(2) "Are Equilon's and Motiva's claimed efficiencies sufficient such that SRI, Shell and Texaco are not subject to per se or quick look liability?"Joint Argument at i.

The parties appear to have borrowed this formulation from language in our Rule 12(b)(6) order. At that stage, we accepted Plaintiffs' allegations as true and identified any possible factual basis for § 1 per se or quick-look liability. That categorical framework is not as helpful at the summary judgment stage. We can now analyze the relevant legal principles in the context of a significant body of evidence.

In light of the admitted cost savings and significant commitment of resources into what appear to be legitimate joint ventures, Joint Fact ¶ ¶ 39, 48, we address two ultimate questions: (1) whether a reasonable trier of fact could conclude that Equilon and Motiva are either mere window-dressings for a price fixing conspiracy or (2) whether they are otherwise patently anticompetitive.

Since Plaintiffs waived any reliance on the rule of reason, we will not weigh all of the claimed benefits and purported anticompetitive effects to determine if the anticompetitive effects predominate. See, e.g.,Cal. Dental Ass'n v. FTC, 224 F.3d 942, 947 (9th Cir.2000); Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1063 (9th Cir.2001) (describing shifting burdens under rule of reason). The question is not whether Defendants violated § 1, but whether their conduct falls under the exceptional § 1 per se or quick-look doctrines. Moreover, Plaintiffs abandoned the per se or quick-look theory of market division.

A. *Per se Analysis*

To establish per se liability, Plaintiffs must do more than prove that Equilon and Motiva "more likely than not" affected competition negatively. Am. Ad Mgmt. v. GTE Corp., 92 F.3d 781, 787 (9th Cir.1996). The "per se approach can only be applied to an agreement which 'facially appears to be one that would almost always tend to restrict competition and decrease output." ' Id. (quotingNCAA v. Bd. of Regents of

Case 3:07-cv-04296-MJJ    Document 28-4    Filed 11/01/2007    Page 2 of 11

Not Reported in F.Supp.2d                                                                       Page 2
Not Reported in F.Supp.2d, 2002 WL 34099815 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

*Univ. of Okla.,* 468 U.S. 85, 100, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984)); *see also Eichorn v. AT & T Corp.,* 248 F.3d 131, 138 (3d Cir.2001) ("[O]n its face, [it] has 'no purpose except stifling competition.' "). Stated another way, if the conduct "does not invariably have anticompetitive effects," we will not condemn it under a per se analysis. *United States v. United States Gypsum Co.,* 438 U.S. 422, 441 & n. 16, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); *see also* 1 Von Kalinowski et al., Antitrust Laws and Trade Regulation § 13.04, at 13-21 (2d ed.1996).

*2 For example, true price fixing is so "plainly anticompetetive," and so lacking in "any redeeming virtue," that we automatically condemn such arrangements as presumptively unreasonable. *BMI v. CBS,* 441 U.S. 1, 8, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); *NCAA,* 468 U.S. at 100; *see also Eichorn,* 248 F.3d at 142-43. Courts have repeatedly treated horizontal price fixing among competitors as per se violations. *Big Bear Lodging Ass'n v. Snow Summit, Inc.,* 182 F.3d 1096, 1011 (9th Cir.1999).

However, the concept of "price fixing" cannot be applied literally. *BMI,* 441 U.S. at 9. Price fixing "will often, but not always, be a simple matter." *Id.* "When two partners set the price of their goods or services they are literally 'price fixing,' but they are not per se in violation of the Sherman Act." *Id.* Efficient joint ventures often entail agreements on prices and output as well as restrictions on competition, yet do not violate the prohibition against price fixing. *See* XI Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ("Hovenkamp") ¶ 1908, at 229-30 (1998).

If an agreement arguably promotes efficiency or productivity at the time adopted, we should apply the rule of reason and perform a more discriminating assessment. *Polk Bros., Inc. v. Forest City Enters., 776 F.2d 185, 189 (7th Cir.1985).* For example, competitors should be free to combine resources to create products that each could not develop alone. *See BMI,* 441 U.S. at 23. The joint operation may administratively require former competitors to set a single price, but this does not indicate a naked price fixing restraint. The price fixing is "merely ancillary to the main purpose" of producing the new product. *See id.*

Thus, the per se rule is less likely to apply when an agreement to set prices or impose some other restraint is part of a joint venture "in which persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit." *Ariz. v. Maricopa County Med. Soc'y,* 457 U.S. 332, 356-57, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982); *see also Copperweld Corp. v. Indep. Tube Corp.,* 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (noting joint ventures are usually subject to rule of reason analysis since they unlock potential efficiencies); *Addamax Corp. v. Open Software Distrib.,* 152 F.3d 48, 52 (1st Cir.1998) ("Joint venture enterprises ... unless they amount to complete shams, are rarely susceptible to per se treatment."); XIII Hovenkamp ¶ 2100g, at 14 ("In our relatively open market system we begin with the premise that joint productive activity is socially valuable and it is not antitrust's job to 'approve' joint ventures.").

Because per se violations settle the question of liability without any inquiry into anticompetitive impact, the Supreme Court has cautioned against expanding the per se rule to new business arrangements with which we have little experience. *State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (*citing Fed. Trade Comm'n v. Ind. Fed'n of Dentists,* 476 U.S. 477, 458-59 (1986)). "Where the conduct at issue is not garden-variety ..., we have eschewed a per se rule and instead have utilized a rule of reason analysis." *Metro Indus. v. Sammi Corp.,* 82 F.3d 839, 844 (9th Cir.1996); *see also Am. Ad Mgmt.,* 92 F.3d at 784. As a result, when conduct falls outside typical per se categories of "horizontal price fixing, division of markets, group boycotts, tying arrangements, and output limitations," we generally apply a rule of reason analysis. *See Am. Ad. Mgmt.,* 92 F.3d at 784; *Big Bear Lodging Ass'n,* 182 F.3d at 1011.

B. *Quick-Look Analysis*

*3 Conduct outside the narrow per se categories can be condemned short of a full rule of reason analysis if "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC,* 526 U.S. 756, 770, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999). Much like per se treatment, quick-look analysis applies "when the great likelihood of anticompetitive effects can easily be ascertained." *Id.* Our experience with such combinations must be so clear that we can confidently conclude the principal result will be anticompetitive. *Id.* at 781. If the potential anticompetitive effects are "far from

Case 3:07-cv-04296-MJJ   Document 28-4   Filed 11/01/2007   Page 3 of 11

Not Reported in F.Supp.2d                                                                                      Page 3
Not Reported in F.Supp.2d, 2002 WL 34099815 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

intuitively obvious," we resort to a complete rule of reason analysis. *Id.* at 759.

C. *Initial Assessment of Evidence*[FN1]

> FN1. The parties address per se and quick-look together in their analysis. We do the same to avoid needless repetition and because the principles are substantially similar. *SeeCal. Dental. Ass'n, 526 U.S. at 779.*

Several undisputed facts appear to foreclose the conclusion that Equilon and Motiva are nothing but window-dressings for an old-fashioned price fixing cartel or are otherwise patently anticompetitive. Though the parties dispute the exact extent of integration, both ventures control significant refining and marketing assets. *See* Joint Facts ¶ 48. Both entail risk sharing based on the Defendants' respective capital investments. *Id.* ¶¶ 43, 47;*see also Maricopa County, 457 U.S. at 356-57.* Both have in fact achieved cost savings, Pls.' Facts ¶¶ 39-41, and each manufactures and markets branded gasoline. Joint Facts ¶¶ 10, 42, 45, 53. In other words, Equilon and Motiva have achieved their parents' stated goals. On its face then, the undisputed evidence shows potential and realized efficiencies occurring within functioning and integrated enterprises.

Plaintiffs contend that every combination, whether efficient or anticompetitive, realizes cost savings from "closing offices, eliminating positions, and avoiding capital expenditures...." Joint Argument at 25-26. Plaintiffs argue that Defendants cannot avoid per se or quick-look liability by identifying cost savings alone. However, businesses regularly combine resources to realize cost savings through elimination of redundant workers, capital, and overhead expenses. *See, e.g.,* Fed. Trade Comm'n and U.S. Dep't of Justice, 1992 Horizontal Merger Guidelines § 4 (revised April 8, 1997); XIII Hovenkamp ¶ 2100, at 4, ¶ 2121b, at 117. So long as the newly formed business maintains a comparable level of production, it makes more efficient use of the remaining resources. Here, we have no evidence that Defendants decreased their overall level of production after forming Equilon and Motiva.

In any event, the undisputed evidence shows that Defendants anticipated operating efficiencies beyond cost savings alone. Defendants predicted that Equilon and Motiva would benefit from greater economies of scale. *See, e.g.,* Vol 2, Tab 3 at 35; Vol. 3, Tab 25 at 820-21. The physical proximity of some refineries meant Defendants could improve overall efficiency through, among other things, the sharing of inputs and transportation costs. *See, e.g.,* Defs.' Vol. 1, Tab 11 at 242, Tab 12 at 280; Vol. 2, Tab 19 at 454; Vol. 3, Tab 25 at 819, 844. Defendants also expected to tap into the capacity of previously unused pipelines, simultaneously eliminating the need to rely on third-party carriers. *See, e.g.,* Defs.' Vol. 3, Tab 25 at 854, Tab 35 at 1205. Though in some instances Defendants expected to close refineries, those refineries were operating well below capacity, allowing Defendants to increase the efficiency of the remaining ones. *See, e.g.,* Tab 25 at 843, Tab 29 at 971.

*4 In addition to improved use of physical resources, Defendants anticipated economic benefits from an expanded knowledge base. They anticipated reductions in the number of plant failures from exchanges regarding best practices. *See, e.g.,* Defs.' Vol. 3, Tab 25 at 791, 822-23. Defendants also could share knowledge and technologies acquired through research and development programs. *See, e.g.,id.* at 809.Consequently, the claimed savings from forming Equilon and Motiva did not relate solely to the elimination of redundant costs.

Plaintiffs next argue that all such cost savings and efficiencies are legally irrelevant in the context of anticompetitive combinations. Joint Argument at 26. However, this argument takes for granted the existence of a per se or quick-look violation.[FN2] Unless and until Plaintiffs establish a per se or quick look violation, such as price fixing, we cannot categorically ignore identified and realized efficiencies. *See, e.g.,Copperweld, 467 U.S. at 768;Polk Bros., 776 F.2d at 189.*

> FN2. Moreover, Plaintiffs rely on § 2 monopoly cases for this proposition of law. In § 2 cases, cost savings and efficiencies are irrelevant because we are concerned with the dangers inherent in overwhelming market power. Plaintiffs have not brought a § 2 claim. *See* XIII Hovenkamp ¶ 2101, at 17 ("[J]oint ventures are analyzed under the 'restraint of trade' standard rather than the monopoly standard.").

D. *Plaintiffs' Arguments*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-04296-MJJ   Document 28-4   Filed 11/01/2007   Page 4 of 11

Not Reported in F.Supp.2d                                                                                              Page 4
Not Reported in F.Supp.2d, 2002 WL 34099815 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

### 1. Plaintiffs' Price Fixing Theory

Plaintiffs approach the question of price fixing too literally. Though Equilon and Motiva charge different prices for Shell and Texaco branded gasoline, according to Plaintiffs, both "fix" prices because each has decided to price the brands together. As a hypothetical, Equilon may sell Shell and Texaco branded gasoline for $1.50 a gallon, while Motiva sells the same gallon for $1.75, but both "fix" prices because, whatever price they charge, each prices Shell and Texaco branded gasolines the same.

Plaintiffs' theory would impose artificial and unnecessary requirements on joint ventures. Whether Equilon and Motiva charge the same or different prices for both brands, each literally "fixes" a price where Defendants formerly set prices independently. Yet they and every other joint venture must, at some point, set prices for the products they sell. See *BMI*, 441 U.S. at 9.

Because almost any price setting constitutes price fixing under Plaintiffs' theory, Defendants would violate § 1 per se even if Equilon and Motiva had absolutely no connection to or interaction with each other. To avoid price fixing according to Plaintiffs' theory, Shell, Texaco and SRI would have to independently price the branded gasoline for Equilon or Motiva. While this may be possible temporarily, or in particular circumstances, there is no basis for imposing such an artificial arrangement indefinitely as a matter of law.[FN3] "[A] producer is free to fix and publish a retail price for his product and solicit business at that price." See *Dunn v. Phoenix Newspapers, Inc.*, 735 F.2d 1184, 1187 (9th Cir.1984).

> FN3. At oral argument, Plaintiffs pointed out that Equilon and Motiva at least temporarily relied on their parents' former pricing systems. Equilon and Motiva apparently relied on the old pricing systems until new ones could be developed. Developing a new system would be one of the challenges faced by the joint ventures as they combined the considerable assets of their parents. The fact they temporarily relied upon the old systems does not explain why, as a matter of law, they should be required to do so indefinitely.

Plaintiffs would only allow joint ventures to establish prices for products that were somehow fundamentally new or different from those made by the parents. Requiring joint ventures to invent fundamental new products to operate independently or justify their existence would eliminate several types of efficient and pro-competitive combinations. Companies regularly combine assets for the legitimate purpose of realizing cost savings through economies of scale and information exchange, not only to develop new products.

*5 In addition, Plaintiffs' price fixing theory is contrary to the undisputed facts. One person at Equilon and one person at Motiva set prices for both brands according to market conditions within their respective territories. Joints Facts ¶¶ 18-21, 62-63. Shell, Texaco and SRI did not jointly agree pre-or post-formation on one universal price that would be applied nationally through Equilon and Motiva. Furthermore, they had no reason to fix prices because once Equilon and Motiva were formed, Shell, Texaco and SRI no longer competed in the market for Shell and Texaco branded gasoline, either amongst themselves or against the ventures in the United States. Equilon and Motiva operate in different regions of the country and thus also do not compete against each other. *Id.* ¶¶ 42, 45, 62-63. A decision by Equilon to raise prices throughout the West Coast would not enable Motiva to raise prices on the East Coast.

Plaintiffs' theory has less to do with price fixing than with combinations in general. In essence, Plaintiffs seek per se or quicklook treatment because of the loss of a competitor. With few exceptions, Plaintiffs' theory would act as a per se rule against joint ventures between companies that produce competing products. Every such venture deprives the market of a competitor to the extent that where there were two or more entities producing a product, now there is one. Because of this, and the reasons stated above, we decline to adopt Plaintiffs' theory of price fixing.

### 2. Equilon and Motiva as Shams

As an alternative to their per se price fixing theory, Plaintiffs contend the ventures have an overall and presumptively anticompetitive purpose or structure. We address Plaintiffs' numerous arguments on this subject individually and then as a whole.

#### a. Pre-formation Conduct and Decisions

Case 3:07-cv-04296-MJJ    Document 28-4    Filed 11/01/2007    Page 5 of 11

Not Reported in F.Supp.2d                                                                                                   Page 5
Not Reported in F.Supp.2d, 2002 WL 34099815 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

*i. Regulatory Review and Confidentiality Agreements*

According to Plaintiffs, Defendants from the outset expected that any combination would be subject to regulatory review. Pls.' Facts ¶ 14. They executed confidentiality agreements, which included provisions to return or destroy information exchanged during the discussion / negotiation stage. *Id.* ¶ 15. Defendants purportedly failed to produce confidential documents exchanged during negotiations for government regulators. *Id.* ¶ 17. Thus Plaintiffs argue Defendants must have had an anticompetitive purpose.

Given Defendants' size, the nature of the oil industry, and the magnitude of the contemplated ventures, any business person would anticipate regulatory review. Defendants' foresight proves nothing. Second, confidentiality agreements serve an important business purpose. They protect sensitive financial information from dissemination or misuse by competitors, while enabling companies to explore potential collaborative efforts.

Withholding information from regulators could suggest an illegitimate motive. *Id.* ¶ 17. However, Plaintiffs have no evidence that Defendants concealed documents. Plaintiffs cite two depositions: one deponent states she has no knowledge on the matter, Pls.' Vol. 2, Tab 17, at p. 356, and the other was not asked about the production of documents for regulators, *id.* at pp. 358-60. Without such evidence, Plaintiffs have failed to make any showing of an anticompetitive purpose based on the confidentiality agreements.

*ii. Exclusion of Assets*

*6 Plaintiffs claim the exclusion of various assets from Equilon and Motiva reveals that Defendants never intended Equilon or Motiva to operate as integrated joint ventures. However, the purpose of joint ventures is to combine particular productive assets without undertaking complete mergers. *See, e.g.,* Fed. Trade Comm'n and U.S. Dep't of Justice, Antitrust Guidelines for Collaborations Among Competitors § 1.1, at 2, § 3.2, at 8 (April 2000) ("Antitrust Guidelines"). To realize the full benefits of a joint venture, the parents must of necessity exclude unrelated assets.[FN4] As always, the parents attempt to allocate resources where they will be most productive.

FN4. To the extent Plaintiffs believe *Citizen Publishing Co. v. United States,* 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969), requires complete mergers, we disagree. *Citizen Publishing* did not "prevent all forms of joint operation." *Id.* at 135; *see also infra* Section II. D.3.

Here, Defendants formed Equilon and Motiva for the purpose of combining their downstream refining and marketing operations for branded gasoline. Joint Facts ¶¶ 12, 31, 33, 36, 39, 40, 42, 45, 45. They did not include their worldwide businesses, upstream operations, marine fuels, aviation fuels, or chemical production plants, if any, because those assets and entities are not part of Defendants' downstream operations in the United States.

When selecting which assets to include in a joint venture, a parent company may reserve assets that serve vital functions in other businesses. Here, Defendants did not transfer ownership of the Shell and Texaco brands to Equilon and Motiva because they rely on those brands in other businesses around the globe. Because of the brands' international importance and value, forcing Shell and Texaco to transfer the brands to Equilon or Motiva is akin to requiring them to choose between merging or abandoning any joint venture. Joint venture parents are not required to abandon or devalue long-standing investments in brand good-will to avoid per se or quick-look condemnation. Furthermore, Equilon and Motiva have an exclusive right to license Shell and Texaco branded gasoline in the United States, Defs.' Fact ¶ 47, which is more than sufficient to enable each to fulfill its purpose.

A joint venture parent may also exclude assets because of prior commitments. In this case, the uncontroverted evidence is that Shell could not contribute Deer Park because it was a joint venture with PEMEX-the Mexican national oil company-and PEMEX rejected the proposal. Pls.' Facts ¶ 22 (Defs.' Response); Defs.' Facts ¶ 44. This is a legitimate reason for excluding Deer Park. Moreover, Shell's inability to include Deer Park explains why Texaco and SRI received the right to operate one comparable refinery independently. Pls.' Facts ¶ 27 and Defs.' Response. In any event, Plaintiffs have not explained how the exclusion of one relevant asset renders either Equilon or Motiva a sham. No reasonable trier of fact could conclude that the exclusion of Deer Park under these circumstances demonstrates that the joint ventures were shams designed to conceal price

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3872830.1

Case 3:07-cv-04296-MJJ   Document 28-4   Filed 11/01/2007   Page 6 of 11

Not Reported in F.Supp.2d                                                                                                    Page 6
Not Reported in F.Supp.2d, 2002 WL 34099815 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

fixing.

### iii. SRI's Ability to Compete Against Equilon

Since the formation of Equilon and Motiva, SRI has remained free to compete against Equilon. Joint Facts ¶ 60. This right, however, does not indicate that Equilon and Motiva are shams. It would be unnecessary to limit SRI's ability to compete against Equilon since SRI held no financial stake in Equilon. Given the absence of any financial connection between SRI and Equilon, an agreement restricting SRI's ability to compete in the Western United States might instead raise an inference of improper collusion.

### iv. "Sole Risk" Provisions

*7 Plaintiffs consider the presence of "sole risk" provisions evidence that Defendants still compete in the downstream market in the United States, and thus the ventures' only purpose was to drive up prices. To the contrary, the presence of "sole risk" provisions bolsters our initial conclusion that Equilon and Motiva are not patently anticompetitive. The "sole risk" provisions permit Defendants to engage in refining opportunities [FN5] rejected by either Equilon or Motiva. Defs.' Response to Pls.' Facts ¶ 25. Rather than unnecessarily constrain competition, this ensures efficient allocation of resources and promotes beneficial competition. If Shell, Texaco or SRI perceives an opportunity where Equilon and Motiva do not, market principles dictate that they should be free to invest accordingly.

> FN5. The "sole risk" provisions apply to refining, not marketing.

### v. Brand Management Protocol

At the time Equilon and Motiva were formed, Defendants entered into Brand Management Protocol agreements. For example, Motiva's Brand Management Protocol "recognize[s] that coordination between Equilon and [Motiva] of uniform standards established by Texaco for the Texaco Symbols and by Shell for the Shell Symbols ... enhances and protects the value, reputation, prestige and goodwill associated with" those symbols and brands. Pls.' Vol. 1, Tab. 3 at 141. The Protocol agreements regulate the use of the Shell and Texaco brands in the ventures' respective regions. See id. at p. 140. Plaintiffs view these agreements as evidence of Defendants' intent to eliminate competition.

The Brand Management Protocol agreements do not reveal an invidious anticompetitive purpose. Defendants had a mutual and legitimate interest in promoting both brands since they were the principal method for marketing Equilon's and Motiva's products. Since Defendants chose not to merge, they adopted a program to ensure that Equilon's and Motiva's use of the brands would not diminish their value in the United States or abroad.

An agreement defining and regulating acceptable practices for brands does not invariably result in anticompetitive harms. Nor does it reveal a patently anticompetitive purpose. As such, these agreements do not validate Plaintiffs' position.

### vi. Ease of Dissolution

Plaintiffs assert that Equilon and Motiva can be "easily unraveled and dissolved," providing evidence that neither was intended to operate as a productive and integrated economic collaboration. Joint Argument at 17.

Equilon and Motiva are not "fly-by-night" operations. Defendants negotiated for over a year before forming Equilon and Motiva, Joint Facts ¶¶ 6-7, 33-34, which would be unnecessary if they simply intended to fix prices. Plaintiffs do not suggest that the negotiations leading up to the formation of Equilon and Motiva were perfunctory or that Defendants failed to undertake adequate due diligence regarding the potential costs or benefits of formation.

In addition, the right to dissolve Equilon and Motiva upon mutual consent must be evaluated alongside the substantial financial commitments made when forming the ventures. Equilon and Motiva control numerous refineries, lubricant plants, research laboratories, terminals, thousands of service stations, miles of pipeline, and employees. Id. ¶ 48. If Defendants wanted the ability to readily dissolve Equilon and Motiva, they would not have entrusted the ventures with such extensive resources. The significant integration of assets itself suggests that Defendants intended Equilon and Motiva to function as true joint ventures, rather than covers for price fixing. In any event, joint venture agreements frequently provide for dissolution upon mutual consent. The presence of such clauses does not

Case 3:07-cv-04296-MJJ   Document 28-4   Filed 11/01/2007   Page 7 of 11

Not Reported in F.Supp.2d                                                                                                    Page 7
Not Reported in F.Supp.2d, 2002 WL 34099815 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

indicate an intent to illegally fix prices.

*8 Other than by mutual consent, Equilon and Motiva can only be dissolved after five years, effective two years after notice. *Id.* ¶ 51.A five-year minimum with two-years notice would allow Defendants to move forward with Equilon and Motiva, hopefully recouping their investments, while leaving room should changes occur in the market or Defendants' individual circumstances.[FN6] Five years represents a significant commitment to the future of Equilon and Motiva.

> FN6. Plaintiffs allege that Texaco is currently negotiating its withdrawal from the "Alliance, necessitated by Texaco's agreement to be acquired by Chevron."Joint Argument at 17. Chevron's acquisition of Texaco, resulting in Texaco's need to withdraw, serves as an example of why joint venturers provide for dissolution upon consent or reasonable notice.

Consequently, the above-described dissolution provisions are not per se illegal, and we do not see how an observer with only a rudimentary understanding of economics could view them as presumptively anticompetitive, especially in light of the time, effort, and resources invested into Equilon and Motiva. *SeeCal. Dental. Ass'n,* 526 U.S. at 770.

### b. Post-formation Conduct

### i. Members Committee Meetings

Plaintiffs believe that Defendants "govern" Equilon and Motiva through Members Committees, presumably to carry out their price fixing conspiracy. Pls.' Facts ¶ 30. The Members Committee for Equilon consists of four Shell representatives and three Texaco representatives. *Id.* Motiva's Members Committee consists of two representatives from Shell, Texaco and SRI. *Id.* The Members Committees set "policies, business plans, and budgets" for the CEOs and officers running the ventures. *Id.* ¶ 32.Representatives on the Equilon and Motiva Members Committees have separate staffs at their own companies. *Id.* ¶ 42.

To begin, Defendants had a legitimate interest in forming Members Committees to protect their substantial investments in Equilon and Motiva. In fact, it would be difficult to conceive of another method of management of a joint venture where the parents wish to maintain an actual, not passive, role in the advancement of their mutual interests.

Even assuming the same representatives from Shell and Texaco served on both committees, we cannot infer a conspiracy merely because Plaintiffs identified an opportunity to conspire. *In re Citric Acid Litig.,* 191 F.3d 1090, 1103 (9th Cir.1999) (refusing to "infer participation in the conspiracy from the opportunity to do so. Such meetings, at least in and of themselves, do not tend to exclude the possibility of legitimate activity."). The existence of Members Committees does not tend to exclude the equally likely inference of legitimate conduct, such as to protect and promote the Defendants' shared interest in the Shell and Texaco brands.

### ii. Relationship Between Pricing & Purpose

Plaintiffs claim the practice of pricing Shell and Texaco brands the same is not sufficiently related to the joint ventures' beneficial efficiency-producing activities. Joint Argument at 26-28; Pls.' Facts ¶ ¶ 45, 47. Plaintiffs argue that since Defendants did not identify any cost savings related to pricing at the time of formation, they had no reason for subsequently pricing both brands the same, except to raise prices. *Id.*

*9 The fact that Defendants did not identify cost savings related to pricing at the time of formation does not negate the other substantial savings and efficiencies anticipated from formation. Antitrust law does not require every business decision to generate additional identifiable savings to survive per se or quick look scrutiny. Plaintiffs also do not explain how the decision to set the same price for Shell and Texaco branded gasoline after formation is inconsistent with permissible business practices.

Defendants offer a plausible and justifiable reason why Equilon and Motiva would independently choose to set the price of Shell and Texaco branded gasoline the same: from the perspective of the ventures, the products are fungible. While the brands appeal to different customers, Joint Facts ¶ 66, and contain different additives, Pls.' Fact ¶ 46, Plaintiffs provide no evidence that the costs of producing the brands, whether related to physical production, marketing, or advertising, would lead an efficient venture to set different prices for Shell and Texaco branded gasoline.

Case 3:07-cv-04296-MJJ   Document 28-4   Filed 11/01/2007   Page 8 of 11

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2002 WL 34099815 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

*iii. Parallel Pricing*

Plaintiffs assert that "[w]ithin a relatively short time after their formation, Equilon and Motiva implemented a practice of charging the same price for the Shell and Texaco brands of gasoline in each of the pricing areas into which Equilon and Motiva had divided their geographic spheres of operation."Pls.' Facts ¶ 36. "Parallel pricing is a relevant factor to be considered along with the evidence as a whole; if there are sufficient other 'plus' factors, an inference of conspiracy can be reasonable."*In re Citric Acid,* 191 F.3d at 1102.

This is not a case of parallel pricing. Equilon and Motiva do not charge identical prices across the country, and the evidence does not reveal an agreement about what prices the other should charge. The parties stipulate that one person at Equilon sets prices for Equilon's territory, one person at Motiva sets prices for Motiva's territory, and each sets prices based on local market conditions. Joint Facts ¶¶ 62, 63.[FN7]

> FN7. At most, Defendants have exchanged information relating to the marketing of Shell and Texaco branded gasoline. However, information exchange is not per se illegal. *United States Gypsum Co.,* 438 U.S. at 440-41 & n. 16. Some information exchange between Equilon and Motiva is necessary to protect and develop the jointly shared brands as resources.

The conduct in question is consistent with the practical consequences of forming Equilon and Motiva. Once formed, Equilon and Motiva had the power to establish any price for their products, just as any other business does, without collaborating with each other or Defendants. It is arbitrary to infer a conspiracy from the decision to charge the same versus different prices for both brands, since in any event, Equilon and Motiva produce both products and receive all of the revenues. In effect, Plaintiffs want the joint ventures to charge different prices for the brands and thus compete against themselves."[Y]et no law requires competition within a company."*SeeFraser v. Major League Soccer, L.L.C.,* 284 F.3d 47, 56 (1st Cir.2002).

Furthermore, Plaintiffs have failed to overcome an additional burden. If the intent and plan to "fix" prices arose after formation, one cannot immediately assume that Defendants consciously committed themselves to such a scheme either pre- or post-formation. We are not suggesting, as Defendants do, that the post-formation conduct of Equilon and Motiva can never be considered evidence of pre-formation anticompetitive intent. *See* Joint Argument at 44-48 (citing*Copperweld Corp. v. Indep. Tube Corp.,* 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)).*Copperweld* did "not consider under what circumstances, if any, a parent may be liable for conspiring with an affiliated corporation it does not completely own."467 U.S. at 767;*see alsoFraser,* 284 F.3d at 56-60 (rejecting argument that LLC members could not violate § 1 when the only complained of conduct occurred post-formation). But just as we do not attribute the acts of a subsidiary to a parent in other contexts, after a certain point it would be improper to attribute the post-formation conduct of Equilon or Motiva to Defendants for purposes of proving a § 1 conspiracy absent other evidence that the ventures are shams.[FN8]

> FN8. We recognize that a price fixing conspiracy offends § 1 whether former competitors agree beforehand to fix prices immediately upon formation or agree to wait eight months after formation to raise prices. Here, Plaintiffs have not raised a triable issue of fact as to a price fixing conspiracy.

*10 In this case, Equilon and Motiva had a separate and legitimate reason for pricing Shell and Texaco branded gasoline the same-they were fungible. *Seesupra* discussion. Like any other business, they may set prices for their products. *SeeDunn v. Phoenix Newspapers, Inc.,* 735 F.2d 1184, 1187 (9th Cir.1984).

*iv. Strategic Marketing Initiative and "Price Optimization"*

According to Plaintiffs,
Defendants implemented their price fixing in conjunction with a joint program called the Strategic Marketing Initiative, which was developed by Equilon, Motiva, and related service companies as an Alliance-wide program; [it] called for price fixing as a means of "price optimization"; and [it] was regularly reviewed with the Members Committees of both Equilon and Motiva.

Pls.' Facts ¶ 37.

Case 3:07-cv-04296-MJJ    Document 28-4    Filed 11/01/2007    Page 9 of 11

Not Reported in F.Supp.2d                                                                Page 9
Not Reported in F.Supp.2d, 2002 WL 34099815 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Plaintiffs reliance on the Strategic Marketing Initiative combines arguments we have already rejected. First, Plaintiffs rely on the theory that any setting of price by Equilon or Motiva constitutes "price fixing." If this were true, few joint ventures would survive § 1 scrutiny. Second, Plaintiffs attach significance to the fact that the Strategic Marketing Initiative was presented to the Members Committees for Equilon and Motiva. The fact Members Committees considered the same information does not automatically establish a nationwide conspiracy. See In re Citric Acid, 191 F.3d at 1103.

Plaintiffs also overlook the stated purpose of the Initiative, to develop the Shell and Texaco brands. Equilon and Motiva had a separate and legitimate interest in marketing the brands. Since Equilon and Motiva produce and market both brands, they have a legitimate reason to consider similar information and strategies. The Strategic Marketing Initiative, much like the Brand Management Protocol agreements, supports maintenance of the brands and their use by the ventures, something which we cannot lightly condemn as unavoidably anticompetitive. See United States Gypsum Co., 438 U.S. at 440-41 & n. 16.

v. Price Anomalies

Plaintiffs want us to assume an anticompetitive purpose or structure from the fact that Equilon and Motiva's wholesale prices rose when crude oil prices hovered around historic lows. Pls.' Facts ¶ 38.

If Equilon and Motiva were the only participants in the downstream market who raised prices during this period, one might suspect that they engaged in some type of anticompetitive collaboration. Yet we cannot determine whether all other downstream refiners also enjoyed higher wholesale prices despite the record low prices for crude oil. As a result, we might condemn Equilon and Motiva for benefitting from a phenomenon experienced across the entire downstream market at that time.[FN9]

> FN9. Even if we assume Equilon and Motiva controlled over twenty-five (25) percent of the branded gasoline in specific markets, Pls.' Facts ¶ 33, we have no evidence that Equilon and Motiva contributed to the *national* rise in wholesale prices. Even in a concentrated market, "rising prices do not themselves permit an inference of a collusive market dynamic." See Brooke Group Ltd. v. Brown & Williamson Tobacco Co., 509 U.S. 209, 236-37, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993).

vi. Failure to "Pass" Savings onto Consumers

Plaintiffs accuse Defendants of never explicitly directing that cost savings be passed onto consumers. Id. ¶ 41. Companies are not required to "pass on" savings to consumers in the form of lower prices. Absent monopoly power or a proven anticompetitive restraint, every business has the legitimate option of passing savings onto consumers in the form of lower prices or to shareholders in the form of increased stock values. The decision to retain all or some of any realized savings does not raise a triable issue on Plaintiffs' contention that the ventures were created for the purpose of fixing prices or that they almost certainly had anticompetitive effects.

vii. Post-formation Cost Savings

*11 Plaintiffs also complain that "The Alliance" eliminated duplicative or redundant expenses and avoided capital expenditures. Pls.' Facts ¶¶ 39, 40. The fact Defendants achieved cost savings bolsters one of their stated legitimate reasons for forming the ventures. The fact they actually commenced such programs indicates Equilon and Motiva were not simply fronts for an illegal conspiracy or combination. Hence, this provides no basis for inferring an anticompetitive purpose.

c. Summary

After carefully reviewing and considering Plaintiffs' evidence and arguments, and drawing all reasonable inferences in Plaintiffs' favor, we nonetheless conclude a reasonable trier of fact could not find that Defendants formed Equilon and Motiva merely to achieve an ulterior anticompetitive purpose or that the ventures are patently anticompetitive. None of the conduct identified by Plaintiffs is of the type that "always tend[s] to restrict competition and decrease output...." Am. Ad Mgmt., 92 F.3d at 787. Our conclusion is reinforced by the fact that Defendants shared risks based on capital contributions, see Maricopa County Med. Soc'y., 457 U.S. at 356-57, and the fact that Equilon and Motiva achieved greater efficiency, productivity, and savings, see Polk Bros., Inc., 776 F.2d at 189.

Case 3:07-cv-04296-MJJ    Document 28-4    Filed 11/01/2007    Page 10 of 11

Not Reported in F.Supp.2d                                                                                                Page 10
Not Reported in F.Supp.2d, 2002 WL 34099815 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

### 3. Citizen Publishing

Despite the evidence of efficiencies and savings, Plaintiffs believe we must follow *Citizen Publishing Co. v. United States*, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969), and hold Defendants liable under the per se and/or quick-look doctrines. The defendants in *Citizen* formed a joint venture to sell and distribute newspapers, yet maintained separate news and editorial departments. *Citizen*, 394 U.S. at 134. The newspapers realized considerable savings from combining their circulation and advertising departments. *United States v. Citizen Publ'g Co.*, 280 F.Supp. 978, 982 (D.Ariz.1968). In spite of the savings, the Supreme Court concluded the joint venture violated § 1 per se. *Citizen*, 394 U.S. at 135. In so doing, the Court relied primarily on three facts: the newspapers pooled profits according to a fixed ratio, agreed not to compete, and improperly divided the market for daily newspapers. *Id.*

The profit pooling and non-compete arrangements in *Citizen* differ in several substantial respects from those in the instant case. First, the defendants, the Star and the *Citizen*, were the only daily newspapers in Tucson, Arizona. *Id.* at 133. By joining their circulation and advertising departments, they eliminated all competition for daily papers in Tucson. *Id.* at 133-34. In contrast, Equilon and Motiva continue to compete with several major oil companies in their relevant markets.

Second, the *Star* and the *Citizen* combined for the specific purpose of restricting competition and fixing prices. *Citizen Publ'g*, 280 F.Supp. at 993. Before forming the venture, the *Star* and the *Citizen* agreed to raise advertising rates within one year and in fact raised rates within that period. *Id.* at 982. The Supreme Court could safely presume anticompetitive harms since that was the express purpose from the outset. Without evidence of such an intent here, we cannot lightly ignore the legitimate and significant reasons offered by Defendants.

*12 Third, the non-compete provision in *Citizen* was part of an agreement to divide the market for daily newspapers. It prohibited the *Star,* the *Citizen,* or any of their stockholders or executives from forming a competing daily newspaper in Pima County, the metropolitan area of Tucson. *Citizen*, 394 U.S. at 135-36. It effectively divided the market because there were only two competitors. *Id.* Here, Equilon and Motiva operate in diverse markets with several competitors. In addition, their non-compete provisions are not nearly as broad.[FN10]

> FN10. Even if Defendants' non-compete clauses were analogous, Plaintiffs waived any right to recover under a § 1 theory of market division. Thus, this aspect of *Citizen* is inapposite.

Consequently, the three reasons supporting the *Citizen* Court's conclusion do not apply to Equilon and Motiva. Still, Plaintiffs note a possible organizational similarity between the joint venture in *Citizen* and Equilon and Motiva. The joint venture in *Citizen* priced, sold and distributed newspapers, yet the *Star* and *Citizen* maintained separate news and editorial departments. Equilon and Motiva market and refine gasoline, yet Shell and Texaco retain the ultimate rights to the Shell and Texaco brands and additives.

This organizational similarity, if any, does not compel per se condemnation. The joint venture in *Citizen* performed one aspect of producing newspapers, the physical printing and distribution, yet set prices and advertising rates as if it was responsible for all aspects of production. In this case, Equilon and Motiva have responsibility for purchasing necessary inputs and then refining and marketing Shell and Texaco branded gasoline. It is therefore appropriate that they set prices for Shell and Texaco branded gasoline.

To the extent other similarities may exist between the venture in *Citizen* and Equilon and Motiva, they do not justify per se condemnation. *Citizen* did not elaborate on its § 1 per se analysis, and Plaintiffs cite no authorities building upon this part of the analysis.[FN11] We are reluctant to hypothesize about its application given recent Supreme Court admonitions against expanding the scope of per se liability. *Khan,* 522 U.S. at 10 (*citing Ind. Federation of Dentists,* 476 at 458-59); *see also Sammi Corp.,* 82 F.3d at 844.

> FN11. Congress overruled *Citizen* by statute as it applied to combinations between newspapers. *See Haw. Newspapers Agency v. Bronster,* 103 F.3d 742, 744 (9th Cir.1996) (citing Newspaper Preservation Act, 15 U.S.C. §§ 1801-04 (1970)).

### 4. Summary of Per se / Quick-Look

We recognize that upon a full rule of reason analysis the anticompetitive effects attendant to the formation of Equilon and Motiva, if any, might outweigh the benefits Defendants realized in cost savings and efficiencies. However, Plaintiffs have eschewed an exhaustive rule of reason analysis. We conclude Plaintiffs have failed to raise a triable issue of material fact on either price fixing or the presumptively anticompetitive nature of Equilon and Motiva. As a result, Plaintiffs failed to raise a triable issue of fact as to Defendants' liability under the per se or quick-look doctrines.

### III. Disposition

Accordingly, Defendants' Motion is GRANTED as Plaintiffs failed to raise a triable issue of fact as to per se or quick-look § 1 liability. Defendants' purported *Copperweld* defense is DENIED as moot. Plaintiffs' Motion is DENIED.[FN12]

> FN12. Plaintiffs carry the ultimate burden of proof at trial and have the burden of showing entitlement to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Because we conclude they failed to even raise a triable issue of material fact, they cannot show entitlement to judgment as a matter of law.

*13 IT IS SO ORDERED.

C.D.Cal.,2002.
Dagher v. Saudi Refining, Inc.
Not Reported in F.Supp.2d, 2002 WL 34099815 (C.D.Cal.)

END OF DOCUMENT