Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 34099816 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

▶
Dagher v. Saudi Refining, Inc.
C.D.Cal.,2002.
Only the Westlaw citation is currently available.
United States District Court,C.D. California.
Fouad N. DAGHER, et al., Plaintiffs,
v.
SAUDI REFINING, INC., et al. Defendants.
No. CV 99-6114-GHK(JWJX).

May 21, 2002.

Daniel R. Shulman, David M. Sullivan, Shulman Law Offices, Minneapolis, MN, John H. Boone, John H. Boone Law Offices, Joseph M. Alioto, Alioto Law Firm, San Francisco, CA, Thomas P. Bleau, Bleau Fox & Fong, Los Angeles, CA, for Plaintiffs.
Brian Arnold, Kirkland & Ellis, Bryan A. Merryman, White & Case, Dale J. Giali, Howrey, Thomas J. Nolan, Skadden ArpsSlate Meagher and Flom, Bradley S. Phillips, Ronald L. Olson, Stuart N. Senator, William D. Temko, Munger Tolles and Olson, Los Angeles, CA, Michael Shuster, White & Case, New York, NY, Alan M. Grimaldi, Eric J. McCarthy, Kristen S. Scammon, Patricia G. Butler, Victor J. Miller, William R. O'Brien, Howrey Simon Arnold & White, Washington, DC, for Defendants.

MEMORANDUM AND ORDER RE: JOINT BRIEFINGS ON MOTIONS FOR SUMMARY JUDGMENT (PART ONE: Re: PLAINTIFFS' STANDING AGAINST SRI)
KING, J.

I. Introduction

*1 This matter is before the court on the parties' joint briefings on motions for summary judgment. The motions came on regularly for hearing on December 10, 2001. We rule as follows on SRI's motion with respect to standing after considering the joint briefs, all pertinent papers, the evidence, and oral argument:

II. Procedural History

On June 15, 1999, Plaintiffs Fouad N. Dagher et al. commenced this action on behalf of themselves and approximately 23,000 Shell and Texaco branded service station owners nationwide. On January 28, 2001, in an amended order, we granted in part and denied in part Defendants' Rule 12(b)(6) motion to dismiss. We granted the motion insofar as Plaintiffs based a § 1 claim on division of markets and customers, and manipulation of service station leases. We denied the motion to the extent Plaintiffs alleged a § 1 price fixing conspiracy through the vehicle of two joint ventures: Equilon Enterprises LLC ("Equilon"), located in the Western United States, and Motiva Enterprises LLC ("Motiva"), located in the Eastern United States.

Though Plaintiffs amended their complaint to reallege market division and lease manipulation, Pls.' Second Am. Compl. ¶¶ 99-100, 103, they have since explicitly waived reliance on either theory as an independent basis for § 1 liability. See, e.g., Tr. of Hearing on Mot. to Dismiss, 14:23-15:6; 15:24-16:8 (December 6, 1999). In addition, Plaintiffs have limited themselves to the per se and quick-look doctrines, forsaking the traditional rule of reason analysis. We approach the cross-motions for summary judgment in light of this particular procedural posture.

III. Undisputed Facts [FN1]

FN1. Pursuant to an earlier order, the parties filed a "Joint Stipulation of Uncontroverted Facts and Conclusions of Law" on July 27, 2001. On October 5, 2001, they filed a new copy to conform with changes in the Local Rules and incorporate the deposition testimony of a Defense witness. For ease of reference, the facts stipulated to by all parties are herein referred to as "Joint Facts". Additional statements of uncontroverted facts will be referred to as "Pls.' Facts" or "Defs.' Facts".
The parties also refiled a "Joint Stipulation of Parties with Respect to Issues to be Decided for Summary Judgment," hereinafter cited as "Joint Argument."

A. *Terminology*

Major oil companies describe operations as "upstream" or "downstream". Joint Facts ¶ 12. Upstream operations consist of exploring for and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3872829.1

Not Reported in F.Supp.2d    Page 2
Not Reported in F.Supp.2d, 2002 WL 34099816 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

producing crude oil. *Id.* Downstream operations entail refining crude into gasoline and other products, and marketing the finished goods. *Id.*

For Defendants, the wholesale level consists of selling branded gasoline in bulk to retailers and resellers. *Id.* ¶ 15.Retailers sell branded gasoline to consumers at service stations. *Id.*

### B. *Pre-Formation Negotiations*

Prior to the formation of the joint ventures, Shell Oil Company ("Shell"), Texaco, Inc. ("Texaco") and Star Enterprise ("Star") [FN2] independently refined and marketed gasoline at both the wholesale and retail levels through their own marketing departments. *Id.* ¶¶ 15, 25, 62.Each Defendant set wholesale prices within its own refining and marketing organization. *Id.* ¶¶ 26-27.

> FN2. From 1989 to 1998, Saudi Refining, Inc. and Texaco operated a joint venture, Star Enterprise, in the Eastern United States. Joint Facts ¶ 4. Star refined and marketed gasoline under the Texaco brand. *Id.*

Shell, Texaco and Saudi Refining, Inc. ("SRI") considered the downstream refining and marketing business intensely competitive and expected the intense competition to continue. *Id.* ¶ 31.In March of 1996, Shell and Texaco discussed, among other things, consolidation of their downstream assets in the United States. *Id.* ¶ 33.Star joined the discussions at some point thereafter. *Id.* ¶ 34.

*2 Shell, Texaco and Star believed the oil industry was about to enter a period of consolidation. *Id.* ¶ 35.They established a synergy team and steering committee with employees from all three companies to explore the possibility of consolidation. *Id.* ¶ 36.The synergy team exchanged information on historical refining and marketing margins, and revenue and profitability forecasts. *Id.* ¶¶ 37-38.

In June of 1996, the team reported that combining downstream operations could potentially reduce costs by $800 million annually, $550 million attributable to Equilon and $250 million attributable to Motiva. *Id.* ¶ 39.Encouraged, Texaco, Shell and SRI formed negotiating teams to formulate terms for a combination. *Id.* ¶ 40.During the negotiations, Texaco and Shell established a standstill agreement under which Shell agreed not to initiate a takeover of Texaco for a specified period. *Id.* ¶ 41.

### C. *Formation / Terms of Formation*

Equilon was formed on January 1, 1998, and Motiva was formed on July 1, 1998.*Id.* ¶¶ 6-7.Under the Equilon agreement, Shell and Texaco allocated gains and losses in proportion to the assets contributed at formation: Shell 56% and Texaco 44%. *Id.* ¶ 43.Similarly, Shell, Texaco and SRI shared risks and losses in proportion to the assets contributed to form Motiva: [FN3] Shell 35% and Texaco and SRI 32.5% each. *Id.* ¶¶ 46-47.

> FN3. Star was terminated, and its assets unwound. *Id.* ¶ 44.

The downstream assets in Equilon and Motiva include twelve refineries, twenty-three lubricant plants, two research laboratories, 22,000 branded service stations, over 24,000 miles of pipeline, 107 terminals, and approximately 24,000 employees. *Id.* ¶ 48.Shell and Texaco did not include their marine fuel businesses or upstream operations. *Id.* ¶¶ 49-50.Texaco and Shell also did not transfer ownership of their trademarks to Equilon or Motiva. *Id.* ¶ 52.

Equilon and Motiva market gasoline under the Shell and Texaco brands [FN4] pursuant to written license agreements. *Id.* ¶¶ 52-53.The licenses are subject to Brand Management Protocal agreements that generally require that both brands be preserved and treated equally. *Id.* ¶¶ 54-55.In addition, a Brand Management Council oversees the use and management of the Shell and Texaco brands. *Id.* ¶ 56.

> FN4. To some extent, Shell and Texaco brands appeal to and target different customers. *Id.* at ¶ 66.Texaco customers tend to be blue-collar and rural, while Shell customers are more affluent and urban. *Id.*

Shell and Texaco agreed not to compete with Equilon, and agreed not to manufacture and market certain products in Equilon's geographic area (the Western United States), including fuel, synthetic gasoline and electricity.*Id.* ¶ 58.Shell, Texaco and SRI agreed not to compete with Motiva, and agreed not to manufacture and market certain products in Motiva's geographic area (the Eastern United States), including fuel, synthetic gasoline and electricity. *Id.* ¶

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3872829.1

Case 3:07-cv-04296-MJJ     Document 28-5     Filed 11/01/2007     Page 3 of 6

Not Reported in F.Supp.2d                                                                                     Page 3
Not Reported in F.Supp.2d, 2002 WL 34099816 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

59. Under the Motiva agreement, SRI retained the option of refining and marketing in the Western United States. *Id.* ¶ 60.

Equilon and Motiva have their own Chief Executive Officers ("CEO").*Id.* ¶ 57. They can be dissolved at any time by mutual consent and unilaterally after five years, effective two years after notice. *Id.* ¶ 51.

### D. *Post-Formation*

*3 "The formation of Equilon ended competition between Shell and Texaco in the Western United States with respect to downstream refining and marketing of gasoline."*Id.* ¶ 42. "The formation of Motiva ended competition between Shell and Star in the Eastern United States with respect to the downstream refining and marketing of gasoline."*Id.* ¶ 45. One person at Equilon sets prices for both Shell and Texaco brands in Equilon's pricing area, and one person at Motiva sets prices for both brands in Motiva's area. *Id.* ¶ 62.

Equilon and Motive set prices in thousands of distinct geographic trade areas based on local conditions. *Id.* ¶¶ 18-21, 63. They refine, maintain and market Shell and Texaco branded gasoline directly to independent Texaco and Shell service station operators, who own or lease service stations from Equilon or Motiva. *Id.* ¶¶ 10, 61.

Plaintiffs never purchased gasoline from SRI, Star or Motiva. *Id.* ¶ 9.

### IV. Summary Judgment

Summary judgment is appropriate when no dispute exists as to the material facts, and the moving party is entitled to judgment as a matter of law.Fed.R.Civ.P. 56; *see, e.g.,Toscano v. Prof'l Golfers' Ass'n,* 258 F.3d 978, 982 (9th Cir.2001). We view the evidence in the light most favorable to the non-movant. *County of Toulumne v. Sonora Cmty. Hosp.,* 236 F.3d 1148, 1154 (9th Cir.2001) (citing*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The non-movant can defeat summary judgment by demonstrating that the evidence, taken as a whole, could lead a rational trier of fact to find in its favor. *Id.* (citing*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

The parties must "set forth specific facts showing that there is a genuine issue for trial."Fed.R.Civ.P. 56(e). A party opposing summary judgment must direct our attention to specific, triable facts. Hon. William W Schwarzer, et al., Cal. Practice Guide: Federal Civil Procedure Before Trial § 14:101.1, at 14-24.2 (2001). General references without page or line numbers are not sufficiently specific. *Id.* (citing*Nissho-Iwai Am. Corp. v. Kline,* 845 F.2d 1300, 1307 (5th Cir.1988)); *see alsoCarmen v. S.F. Unified Sch. Dist.,* 237 F.3d 1026, 1030 (9th Cir.2000) (citing similar holdings in the Fifth, Sixth, Seventh, and Tenth Circuits); *Forsberg v. Pac. Northwest Bell Tel. Co.,* 840 F.2d 1409, 1418 (9th Cir.1988) ("The district judge is not required to comb the record to find some reason to deny a motion for summary judgment."). In the context of cross-motions for summary judgment, we consider specifically identified citations in either party's moving papers as well as their oppositions. *Fair Housing Council v. Riverside Two,* 249 F.3d 1132, 1136 (9th Cir.2001).

### V. Plaintiffs' § 1 Standing with Respect to SRI

Plaintiffs claim they have standing with respect to SRI as a purported co-conspirator with Shell and Texaco in a price fixing conspiracy. Because standing goes to the justiciability of Plaintiffs' claim against SRI, we address that issue first.[FN5]

> FN5. This order resolves only the issue of Plaintiffs' standing against SRI. The remaining issues will be addressed separately in a subsequent order.

#### A. *Antitrust Conspiracy Cases*

*4 Plaintiffs have the initial burden of proving a "contract, combination, or conspiracy between two or more entities" in violation of § 1 of the Sherman Act. 15 U.S.C. § 1; *In re Citric Acid Litig.,* 191 F.3d 1090, 1093 (9th Cir.1999) (citing*Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 763, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)); *see alsoAm. Ad Mgmt., Inc. v. GTE Corp.,* 92 F.3d 781, 788 (9th Cir.1996). To establish § 1 standing, Plaintiffs must prove SRI's antitrust violations, if any, caused them harm. *SeeOrr v. Bank of Am., NT & SA,* 285 F.3d 764, 2002 U.S.App. LEXIS 3418, *37-38 (9th Cir.2002); *Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 989 (9th Cir.2000); *Am. Ad Mgmt., Inc. v. GTE Corp.,* 190 F.3d 1051, 1055 (9th Cir.1998).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3872829.1

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 34099816 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

Since Plaintiffs never purchased products from Motiva, Star or SRI, and waived any claims based on market division, they could not suffer an actionable § 1 harm based on SRI's role in forming Motiva alone. Plaintiffs need some connection between SRI and the alleged price fixing in the Western United States. Therefore, Plaintiffs have set out to prove "that Shell, Texaco, and SRI combined and conspired with each other to fix prices, using the combinations Equilon and Motiva to implement their conspiracy...." Joint Argument, p. 49. Second, "the formation of Equilon and Motiva was itself a violation of Section 1 as a conspiracy by defendants to fix prices."*Id.*"Thus Equilon's price-fixing was part of an Alliance-wide initiative, known to, joined in, and approved of by SRI...."*Id.*, p. 55.

To be liable as a co-conspirator under § 1, a defendant must have a "conscious commitment to a common scheme designed to achieve an unlawful objective."*Toscano v. Prof'l Golfers' Ass'n, 258 F.3d 978, 983 (9th Cir.2001)*. The inference of conspiracy must be reasonable in light of the competing inference that the conduct was engaged in independently and must tend to exclude the possibility of independent action. *In re Citric Acid, 191 F.3d at 1094 (citingMatsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986))*. Conduct as consistent with legitimate competition as illegal price fixing cannot, standing alone, support an inference of antitrust conspiracy. *Id. (citingMatsushita, 475 U.S. at 588))*.

Plaintiffs can raise a genuine issue of material fact by either producing direct evidence of an illegal conspiracy to fix prices, or through circumstantial evidence "from which a reasonable factfinder could conclude that [defendants] conspired" to fix prices. *In re Citric Acid Litig., 191 F.3d at 1093*. Direct evidence requires no inference to reach the proponent's desired conclusion. *County of Tuolumne, 236 F.3d at 1155 (citingIn re Citric Acid, 191 F.3d at 1093-94)*."Direct evidence is that which can defeat a request for summary judgment 'if taken as true,' whereas circumstantial evidence can defeat a summary judgment motion only if inferences are drawn in the nonmovant's favor."*Toscano, 258 F.3d at 983*.

*5 If Plaintiffs have only circumstantial evidence of conspiracy, Defendants can rebut the "allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice."*Id.* at 1094 (*quotingRichards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir.1987)*). At that point, the burden shifts back to Plaintiffs to provide "specific evidence tending to show that the defendant was not engaging in permissible competitive behavior."*Id.* We consider the evidence individually and as a whole to determine if it tends to exclude the possibility of legitimate and independent conduct. *Id.* at 1094-1106.

B. *Plaintiffs' Evidence as to SRI*

Plaintiffs devote less than two pages in opposition to this issue, and provide no citations to the record. Yet, among other things, Plaintiffs filed four volumes of materials totaling 1,054 pages.[FN6]Plaintiffs' only citations in the moving papers appear in a "factual background" on the separate issue of whether Equilon and Motiva are sufficiently integrated to avoid per se or quick-look liability. As a result, most of Plaintiffs' arguments and evidence do not relate to whether SRI specifically and consciously intended to conspire with Shell and Texaco in the Western United States.

> FN6. Defendants submitted fourteen volumes. Hereinafter, where applicable, we cite submissions by volume, tab, and page number.

1. Plaintiffs' Initial Burden

Plaintiffs have no direct evidence that SRI conspired to fix prices. Rather, Plaintiffs argue that the circumstantial evidence taken as a whole establishes SRI was a co-conspirator. Equilon and Motiva allegedly:
were formed as part of a single, unbroken series of negotiations among Shell, Texaco, and SRI to create The Alliance, in which all three shared. After its formation, The Alliance developed a Strategic Marketing Initiative, pursuant to which price-fixing was implemented Alliance-wide in the name of "price optimization," all of which was well-known to the Members Committees of Equilon and Motiva, where SRI was represented by Saudi Aramco executives.[FN7]

> FN7. Plaintiffs refer to Saudi Aramco in an effort to strengthen the alleged connection between SRI and the purported nationwide

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3872829.1

Not Reported in F.Supp.2d                                                                                     Page 5
Not Reported in F.Supp.2d, 2002 WL 34099816 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

conspiracy. Pls.' Facts ¶ ¶ 1, 18, 19, 31. Upon our review, again without the benefit of specific citations to page and line numbers, we found the evidence touching upon Saudi Aramco only relates to the formation of Motiva, the unwinding of Star, and the assumption by Motiva of Star's obligations. *Seeid.* The evidence does not, as Plaintiffs argue, raise an inference that Saudi Aramco directed or instructed SRI to participate in an illegal scheme in the Western United States.

Joint Argument, p. 55 (footnote added).

Plaintiffs have not established that SRI participated in the overall formation of a price-fixing "Alliance." As proof that Motiva was the "culmination" of Defendants' negotiations, Plaintiffs cite "agreements entered into by defendants in connection with the formation of" Equilon and Motiva. Pls.' Fact ¶ ¶ 2-3; Shulman Decl. ¶ ¶ 6-7 (referring to Pls.' Vol. 1, Tabs 2-3). For example, the Equilon Master Agreement mentions that Shell, Texaco and SRI were in negotiations for the creation of "Eastco" (the name initially anticipated for Motiva). Pls.' Vol. 1, Tab 3, p. 27. Similarly, the Motiva Master Agreement mentions that Shell and Texaco had already formed Equilon. *Id.* at p. 82. However, references to potential future agreements or prior agreements do not reveal an intent to engage in price fixing or an illicit conspiracy. Such references are equally consistent with legitimate conduct and sound document drafting.[FN8]

>   FN8. Plaintiffs also cite deposition testimony, none of which tends to implicate SRI.

*6 In addition, a short-hand name adopted after formation, "The Alliance," does not reveal a pre-formation intent to conspire. *See* Joint Arg. p. 55; Pls.' Fact ¶ 4. The name does not tend to exclude the possibility of legitimate coordination, such as for the purpose of protecting the Shell and Texaco brands. *SeeRichards v. Neilsen Freight Lines,* 810 F.2d 898, 903 (9th Cir.1987) (affirming summary judgment and rejecting testimony about a "gentlemen's agreement" as circumstantial evidence of a conspiracy since it was equally consistent with legitimate conduct).

Moreover, Plaintiffs have not adequately shown how the Strategic Marketing Initiative reveals an intent by SRI to conspire as to the Western United States. *See* Joint Arg. p. 55; Pls.' Facts ¶ 37. Plaintiffs' evidence shows that the exchange of information occurred for the purpose of promoting the Shell and Texaco brands. Since Equilon and Motiva rely on the Shell and Texaco brands to market gasoline, they have a mutual and legitimate interest in protecting them. An agreement to protect brands does not reveal an intent to illegally fix prices, let alone an intent by SRI to do so in the Western United States.

In any event, Plaintiffs never explain why SRI would have any interest in participating in a conspiracy to fix prices in the Western United States. SRI has no apparent motive to conspire with Shell and Texaco with respect to Equilon and the Western United States because Equilon and Motiva operate in different regions of the country. SRI also does not share in Equilon's profits and does not itself operate in the Western United States, Joint Facts ¶ 43, so SRI would not benefit from any potential anticompetitive effects in Equilon's territory.

Therefore, Plaintiffs' circumstantial evidence does not tend to exclude the possibility of legitimate conduct on the part of SRI. As Plaintiffs failed to come forward with sufficient evidence to satisfy their initial burden of proving a § 1 conspiracy, SRI is entitled to summary judgment as a matter of law.

### 2. SRI's Plausible and Justifiable Reason

Assuming Plaintiffs satisfied their initial burden, Defendants identified $800 million in potential savings from the formation of Equilon and Motiva, $250 million attributable to Motiva. Joint Facts ¶ 39. Though perhaps optimistic, Plaintiffs do not contend these numbers were fabricated. Nor do Plaintiffs claim that the anticipated savings resulted from a haphazard or cursory evaluation process. Consequently, the undisputed evidence shows that SRI had a plausible and justifiable reason for forming Motiva. The burden now shifts to Plaintiffs to present specific evidence tending to exclude the possibility of legitimate or independent conduct by SRI.

### 3. Plaintiffs' Specific Evidence

Even if we construe Plaintiffs' evidence as overcoming the initial threshold, we find no specific evidence that tends to show SRI consciously committed itself to engage in a conspiracy that included the Western United States. Nor does the evidence raise doubts as to SRI's claimed reason for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3872829.1

Case 3:07-cv-04296-MJJ     Document 28-5     Filed 11/01/2007     Page 6 of 6

Not Reported in F.Supp.2d                                                                                  Page 6
Not Reported in F.Supp.2d, 2002 WL 34099816 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

participating in the formation of Motiva.

### C. *Summary of Evidence*

*7 Plaintiffs lack direct or circumstantial evidence "sufficiently unambiguous to permit a trier of fact to find that [SRI] conspired" to fix prices in the Western United States absent "any apparent motive to do so."*Matsushita, 475 U.S. at 597*. Viewing the evidence in the light most favorable to Plaintiffs, we find no triable issue of fact regarding whether SRI participated in an illegal conspiracy to fix prices in the Western United States in violation of § 1 of the Sherman Act. Therefore, SRI is entitled to summary judgment as a matter of law.

### VI. Disposition

SRI' Motion for Summary Judgment on the issue of antitrust standing is GRANTED.

IT IS SO ORDERED.

C.D.Cal.,2002.
Dagher v. Saudi Refining, Inc.
Not Reported in F.Supp.2d, 2002 WL 34099816 (C.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3872829.1