Westlaw.

369 F.3d 1108                                                                                                                          Page 1
369 F.3d 1108, 2004-1 Trade Cases P 74,432, 04 Cal. Daily Op. Serv. 4680, 2004 Daily Journal D.A.R. 6462
(Cite as: 369 F.3d 1108)

▶
Dagher v. Saudi Refining, Inc.
C.A.9 (Cal.),2004.

United States Court of Appeals,Ninth Circuit.
Fouad N. DAGHER; Bisharat Enterprises Inc.; Alfred Buczkowski; Esequiel Delagado; Mahwash Farzaneh; Nasser El-Radi; G.G. & R. Petroleum Inc.; H.J.F. Inc.; Kaleco Co.; Carlos Marquez; Sami Merhi, Edgardo R. Parungao; Ron Abel Serv. Center, Inc.; Gullermo Ramirez; Jerry'S Shellserv. Center, Inc.; Leopoloo Ramirez; Nazar Sheibaini; Sitara Management Corporation; Tinsel Enterprises Inc.; Quang Truong; Steven Ray Vezerian; Los Feliz Shell, Inc.; Nassim Hanna, Plaintiffs-Appellants,
v.
SAUDI REFINING INC., (SRI); Texaco Inc.; Shell Oil Company, Defendants-Appellees,
andMotiva Enterprises LLC; Equilon Enterprises, Llc; Equiva Trading Company; Equiva Services LLC, Defendants.
No. 02-56509.

Argued and Submitted Oct. 7, 2003.
Filed June 1, 2004.

**Background:** Gasoline service station owners brought class action antitrust action, accusing oil companies of price fixing. The United States District Court for the Central District of California, George H. King, J., granted summary judgment for companies, and appeal was taken.

**Holdings:** The Court of Appeals, Reinhardt, Circuit Judge, held that:

(1) owners lacked standing to sue one defendant, but,

(2) fact issue existed as to whether Sherman Antitrust Act's per se prohibition against price fixing was applicable to economic arrangements between remaining defendants.

Affirmed in part and reversed in part.

Fernandez, Circuit Judge, concurred in part, dissented in part, and filed opinion.
West Headnotes
[1] **Antitrust and Trade Regulation** 29T ⇐822

29T Antitrust and Trade Regulation
    29TX Antitrust and Prices
        29TX(B) Price Fixing in General
            29Tk822 k. Horizontal Arrangements. Most Cited Cases
            (Formerly 265k17(1.12))
Horizontal price fixing agreement is "naked" if it is formed with objectively intended purpose or likely effect of increasing price or decreasing output in short run, with output measured by quantity or quality.

[2] **Federal Courts** 170B ⇐776

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most Cited Cases
District court's grant of summary judgment is reviewed de novo.

[3] **Federal Civil Procedure** 170A ⇐2484

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2484 k. Antitrust and Price Discrimination Cases. Most Cited Cases
Summary judgment procedures should be granted sparingly in complex antitrust litigation. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

[4] **Antitrust and Trade Regulation** 29T ⇐537

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(B) Cartels, Combinations, Contracts, and Conspiracies in General
            29Tk537 k. In General. Most Cited Cases
            (Formerly 265k12(11/4))
Defendant's involvement to some extent in planning of certain aspects of alliance is insufficient to establish participation in anticompetitive conspiracy;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3872836.1

Case 3:07-cv-04296-MJJ    Document 28-6    Filed 11/01/2007    Page 2 of 16

369 F.3d 1108                                                                                          Page 2
369 F.3d 1108, 2004-1 Trade Cases P 74,432, 04 Cal. Daily Op. Serv. 4680, 2004 Daily Journal D.A.R. 6462
(Cite as: 369 F.3d 1108)

rather, for agreement to constitute violation of Section 1 of Sherman Act, defendant's conscious commitment to common scheme designed to achieve unlawful objective must be established. Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

[5] Antitrust and Trade Regulation 29T ☞960

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
                29Tk960 k. In General. Most Cited Cases
                (Formerly 265k28(1.6))
Gasoline service station owners in Western United States lacked standing to assert price fixing conspiracy claims against oil company that participated only in Eastern United States branch of suppliers' national marketing alliance. Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

[6] Antitrust and Trade Regulation 29T ☞821

29T Antitrust and Trade Regulation
    29TX Antitrust and Prices
        29TX(B) Price Fixing in General
            29Tk821 k. In General. Most Cited Cases
            (Formerly 265k17(1.12))
With few exceptions, price-fixing agreements are unlawful per se under Sherman Act; dispositive question generally is not whether any price fixing was justified, but simply whether it occurred. Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

[7] Antitrust and Trade Regulation 29T ☞536

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(A) In General
            29Tk532 Judicially Created Tests of Legality
                29Tk536 k. "Quick Look" and Other Tests. Most Cited Cases
            (Formerly 265k12(1.10))
"Quick look analysis" of allegedly anti-competitive conspiracy applies when *per se* review is inapplicable but when observer with even rudimentary understanding of economics could conclude that arrangements in question have anti-competitive effect on customers and markets. Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

[8] Antitrust and Trade Regulation 29T ☞534

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(A) In General
            29Tk532 Judicially Created Tests of Legality
                29Tk534 k. Per Se. Most Cited Cases
            (Formerly 265k12(1.10))
If antitrust plaintiffs can establish that defendants' conduct falls within range of conduct considered illegal per se, it does not matter whether particular application of per se rule appears inefficient or unfair. Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

[9] Antitrust and Trade Regulation 29T ☞821

29T Antitrust and Trade Regulation
    29TX Antitrust and Prices
        29TX(B) Price Fixing in General
            29Tk821 k. In General. Most Cited Cases
            (Formerly 265k17(1.12))
Price fixing is quintessential example of per se violation of Section 1 of Sherman Act. Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

[10] Federal Civil Procedure 170A ☞2484

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2484 k. Antitrust and Price Discrimination Cases. Most Cited Cases
Issue of material fact as to whether competing oil companies' price fixing agreement was "naked," or merely "ancillary" to their production and marketing joint venture precluded summary judgment on claim that agreement was per se illegal conspiracy in restraint of trade. Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

[11] Antitrust and Trade Regulation 29T ☞920

29T Antitrust and Trade Regulation
    29TXII Antitrust Law and Trade and Professional Associations
        29Tk920 k. In General. Most Cited Cases
        (Formerly 382k914 Trade Regulation)
Robinson-Patman Act concerns did not justify agreement by competing oil companies, who had entered into production and marketing joint venture, to charge same prices for their still-distinct brands of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-04296-MJJ    Document 28-6    Filed 11/01/2007    Page 3 of 16

369 F.3d 1108                                                                                                    Page 3
369 F.3d 1108, 2004-1 Trade Cases P 74,432, 04 Cal. Daily Op. Serv. 4680, 2004 Daily Journal D.A.R. 6462
(Cite as: 369 F.3d 1108)

gasoline; any price differential occurring in absence of agreement would have been predicated on differences between brands, not upon identity of buyers. Sherman Act, § 1, as amended, 15 U.S.C.A. § 1; Robinson-Patman Price Discrimination Act, § 1 et seq., 15 U.S.C.A. § 13 et seq.

**[12] Antitrust and Trade Regulation 29T ☞925**

29T Antitrust and Trade Regulation
 29TXIII Antitrust Law and Joint Ventures
  29Tk925 k. In General. Most Cited Cases
   (Formerly 265k12(11/4))
Sherman Act's per se rule applies to joint venturers' agreement to fix prices of competing goods unless they can demonstrate sufficient relationship between price fixing scheme and furthering legitimate aims of joint venture. Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

*1110 Daniel R. Shulman,Gregory Merz, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, MN; Joseph M. Alioto (argued), Angelina Alioto-Grace, Joseph M. Alioto, Jr., Alioto Law Firm, San Francisco, CA, for appellants.
Stuart N. Senator, Munger, Tolles & Olson LLP, Los Angeles, California, for appellee Shell Oil Co.
Patricia G. Bulter, Howrey, Simon, Arnold & White LLP, Washington, DC, for appellee Texaco Inc.
Bryan A. Merryman, White & Case LLP, Los Angeles, CA, for appellee Saudi Refining, Inc.

Appeal from the United States District Court for the Central District of California George H. King, District Judge, Presiding.  D.C. No. CV-99-06114-GHK.

Before REINHARDT, FERNANDEZ, and RAWLINSON, Circuit Judges.
REINHARDT, Circuit Judge.
Plaintiffs Fouad N. Dagher, et al., appeal from the district court's award of summary judgment to the defendants, Texaco, Inc., Shell Oil Co., and Saudi Refining, Inc. (SRI), et al. The plaintiffs represent a class of 23,000 Texaco and Shell service station owners who allege that the defendants conspired to fix the nationwide prices for the Shell and Texaco brands of gasoline through the creation of a national alliance consisting of two joint ventures. The district court granted two summary judgment motions: one to dismiss defendant SRI because the plaintiffs lacked antitrust standing; the other to dismiss the complaint against the remaining defendants because the plaintiffs failed to raise a triable issue of fact as to whether the Sherman Antitrust Act's *per se* prohibition against price fixing is applicable to the economic arrangements between the defendants. We affirm the district court's ruling as to the plaintiffs' standing to sue SRI, but reverse the district court's decision that the plaintiffs failed to create a triable issue of fact under the Sherman Act.

### I. Factual and Procedural History

### A. Factual History

Texaco, Inc., and Shell Oil Co. were once fierce competitors in the national oil and gasoline markets. They competed at both wholesale and retail levels, and in both upstream and downstream operations.[FN1] The two companies generally operated by independently refining gasoline and then selling the gas either to licensed Texaco *1111 and Shell service stations or to wholesale distributors.

> FN1. The parties have explained in their joint stipulations that "[c]rude oil is the raw product from which gasoline is made at a refinery. Upstream operations consist of exploring for and producing crude oil, and down-stream operations consist of refining crude into gasoline and other products and marketing the finished products."

From 1989 to 1998, defendants Saudi Refining, Inc. (SRI) and Texaco sold gas on the East Coast through Star Enterprise, a joint venture "engaged in the refining and marketing of gasoline under the Texaco brand." Both Shell and Texaco sensed intensified competition in the downstream operations of their industry-they similarly believed that "the oil industry was about to enter a period of consolidation." To respond to the heightened competition in the oil and gas industry, Shell approached Texaco in 1996 about several potential corporate combinations designed to enhance efficiency and reduce competition between the two companies with respect to the downstream refining and marketing of gasoline. In 1998, preliminary discussions yielded an agreement to form a nationwide alliance (hereinafter: "the alliance") [FN2] consisting of two separate joint ventures.[FN3] One joint venture was named "Equilon Enterprises" (Equilon); it combined Shell's and Texaco's downstream operations in the western United States. The other venture, formed by Texaco, Shell, and SRI, was named "Motiva Enterprises" (Motiva); it

Case 3:07-cv-04296-MJJ   Document 28-6   Filed 11/01/2007   Page 4 of 16

369 F.3d 1108                                                                                                    Page 4
369 F.3d 1108, 2004-1 Trade Cases P 74,432, 04 Cal. Daily Op. Serv. 4680, 2004 Daily Journal D.A.R. 6462
(Cite as: 369 F.3d 1108)

combined the three companies' downstream operations in the eastern United States. The alliance had a national market share of 15% of all gasoline sales, and on the West Coast, Equilon's market share exceeded 25%.

> FN2. Defendants dispute that an "alliance" existed and characterize Equilon and Motiva as distinct entities. Appellees' Brief, at 46. While the defendant corporations did not create a new legal entity called "The Alliance," the record establishes beyond dispute that representatives of Texaco and Shell generally referred to the two joint ventures as part of a single project to combine the two companies' nationwide refining and marketing operations. Moreover, the record confirms that the single project was often referred to as "an alliance," and frequently called "The Alliance," by representatives of Texaco, Shell, and SRI, and by Board Members from the two joint ventures, "Equilon Enterprises" (Equilon) and "Motiva Enterprises" (Motiva). When we refer to "the alliance," we therefore refer to the combined national refining and marketing operation consisting of Equilon and Motiva-an enterprise which was created, developed, and maintained collectively by the individual defendant corporations.

> FN3. The district court explained the massive scope of the alliance: "[t]he downstream assets in Equilon and Motiva include twelve refineries, twenty-three lubricant plants, two research laboratories, 22,000 branded service stations, over 24,000 miles of pipeline, 107 terminals, and approximately 24,000 employees."

There is a voluminous record documenting the economic justifications for creating the joint ventures. After analysis by teams made up of representatives of all three companies, the defendants concluded that numerous synergies and cost efficiencies would result. The defendants concluded that nationwide there would be up to $800 million in cost savings annually. The Federal Trade Commission and several State Attorneys General approved the formation of the joint ventures, subject to modifications demanded by both the federal agency and the various Attorneys General.

The creation of the alliance ended competition between Shell and Texaco throughout the nation in the areas of downstream refining and marketing of gasoline. Texaco and Shell signed non-competition agreements which prohibited them from competing with either Equilon or Motiva and committed them "not to engage in the manufacturing and marketing of certain products in the [relevant] geographic area[s], including fuel, synthetic gasoline, and electricity." The two joint ventures established fixed ratios for profit sharing and for bearing the risk of losses. *1112 In Equilon, Shell has a 56% interest while Texaco owns 44%. In Motiva, Shell owns 35%, while SRI and Texaco each own 32.5%.

Despite the collective assumption of risk and resource pooling in the joint ventures, Shell and Texaco continued to operate as distinct corporations. Each retained its own trademarks and kept control over its own brands pursuant to separate Brand Management Protocols, each of which prohibited the joint ventures from giving preferential treatment to either brand. Under the joint venture agreements, Equilon and Motiva market Shell and Texaco gasoline under licensing agreements governing both the sale of the products and the use of the Shell and Texaco trademarks. Each company maintained its ability to return to individual sales and marketing-the joint ventures contain provisions allowing for dissolution at any time by mutual consent or, after five years time, by unilateral dissolution with two years advance notice.

The various agreements between the oil companies allowed Texaco and Shell to consolidate and unify the pricing of the Texaco and Shell gasoline brands within the Equilon and Motiva joint ventures. Before creating the two joint ventures, Shell, Texaco, and Star all independently set prices for their wholesale and retail sales, generally through decisions made by their corporate pricing units. Testimony in the record reveals that, either immediately before the formation of the joint ventures or sometime shortly thereafter, "a decision was made that the Shell and Texaco brands would have the same price in the same market areas." The decision to charge the same price for the two distinct brands "was developed as sort of an operating requirement right from the very start or near to the very start of the alliance." Equilon and Motiva integrated this pricing decision into a project named "The Strategic Marketing Initiative" (SMI), which sought to develop ways in which the alliance could produce and promote both brands more competitively. There is some evidence in the record

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3872836.1

Case 3:07-cv-04296-MJJ   Document 28-6   Filed 11/01/2007   Page 5 of 16

369 F.3d 1108                                                                                                    Page 5
369 F.3d 1108, 2004-1 Trade Cases P 74,432, 04 Cal. Daily Op. Serv. 4680, 2004 Daily Journal D.A.R. 6462
**(Cite as: 369 F.3d 1108)**

establishing that the decision to set one price for the two brands was conceived of in the SMI even before Motiva was formed.[FN4]

> FN4. The record does not establish with certainty whether the decision to price the two brands together was actively discussed during the SMI. The evidence does show that the SMI included a "price optimization" program. And there is some evidence in the record that the price optimization program ratified the unofficial decision to move toward unitary pricing-one witness testified that the price optimization program included "a policy or a procedure to charge the same prices to both-to similar classes of trade in the same marketing areas and to effect those-to effect those changes."

The alliance consolidated pricing of the Texaco and Shell brands such that a single individual at each joint venture was responsible for setting a coordinated price for the two brands. The joint ventures did, however, continue to adjust the pegged price of the brands to each unique geographic sale area. The pricing was consolidated despite the fact that Texaco and Shell maintained each brand as a distinct product-each brand has its own unique chemical composition (the gasoline is differentiated by separate packages of "additives"), trademark, and marketing strategy-and competed for customers "at the pump." The companies, and the joint ventures, continued to target each brand at a different customer base-"Texaco customers tend to be more blue-collared and rural than Shell customers, who are more affluent and urban."

The price optimization program may have allowed Equilon and Motiva to raise gasoline prices at a time when the price of crude oil was low and stable. During a *1113 time when crude oil prices reached near-historic lows-the price of crude oil decreased from $12 to $10 per barrel between September 1998 and February 1999-Equilon raised its prices $.40 per gallon in Los Angeles and $.30 per gallon in both Seattle and Portland.

### B. Procedural History

The plaintiffs commenced this civil action in the United States District Court for the Central District of California. They brought suit on behalf of themselves and approximately 23,000 Shell and Texaco service station owners, alleging that defendants SRI, Texaco, Shell, Motiva, Equilon, Equiva Trading Co., and Equiva Services, LLC, engaged in a price fixing scheme to raise and fix gas prices through the alliance and the two joint ventures, Motiva and Equilon, in violation of Section 1 of the Sherman Antitrust Act, 15U.S.C. § 1. The plaintiffs disclaimed any reliance on the traditional "rule of reason" test, instead resting their entire claim on either the per se rule or a "quick look" theory of liability.

[1] The defendants moved to dismiss under FED. R. CIV. P. 12(b)(6). The issue with respect to the 12(b)(6) motion was "whether the alleged agreement among Saudi, Shell, and Texaco is an unreasonable restraint of trade ... under either the *per se* rule or a 'quick look' rule of reason analysis." The district court denied the motion. The court found that although the *per se* rule against price fixing plainly does not make all price-restraining joint ventures illegal, neither does "[a]n agreement to fix prices ... merit full rule of reason treatment solely because it is part of a broader joint venture agreement." The court explained that "price fixing can still be illegal per se even if it accompanies an efficient, integrated joint venture. If the joint venture could function perfectly well without price fixing, then the price fixing amounts to no more than an extraneous, anticompetitive restraint that does not merit rule of reason analysis." The district court found that the plaintiffs' complaint alleged sufficient facts to demonstrate that the alliance's price setting regime was a naked, rather than an ancillary, restraint on trade.[FN5] The district court disposed of the plaintiffs' alternative theories of liability-the plaintiffs originally alleged a "market division" theory and a "manipulation of leases" theory to support their *per se* Section 1 violation-but gave plaintiffs leave to amend.

> FN5. A "horizontal agreement [is] 'naked' if it is formed with the objectively intended purpose or likely effect of increasing price or decreasing output in the short run, with output measured by quantity or quality." XI HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1905, at 210(1998) (hereinafter: HOVENKAMP).

The parties filed cross-motions for summary judgment. The district court decided the motions in two separate orders. The first order granted SRI's motion for summary judgment on the ground that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3872836.1

Case 3:07-cv-04296-MJJ    Document 28-6    Filed 11/01/2007    Page 6 of 16

369 F.3d 1108                                                                                                           Page 6
369 F.3d 1108, 2004-1 Trade Cases P 74,432, 04 Cal. Daily Op. Serv. 4680, 2004 Daily Journal D.A.R. 6462
(Cite as: 369 F.3d 1108)

plaintiffs lacked antitrust standing because no plaintiff had ever bought gasoline, or other products, from the Motiva joint venture or directly from SRI and because the plaintiffs lacked "direct or circumstantial evidence 'sufficiently unambiguous to permit a trier of fact to find that [SRI] conspired' to fix prices in the western United States absent 'any apparent motive to do so.'" (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

The second order granted the remaining defendants' motion for summary judgment on the ground that the rule of reason, not the *per se* or "quick look" rules, governed the Sherman Act analysis of the joint ventures. The district court applied its own analytical framework, consisting of two *1114 questions: "(1) whether a reasonable trier of fact could conclude that Equilon and Motiva are either mere window-dressings for a price fixing conspiracy or (2) whether they are otherwise patently anticompetitive." The court concluded-relying on the detailed and costly negotiations leading up to the creation of the joint ventures-that Equilon and Motiva were plainly not "fly-by-night" operations designed to cover up an elaborate price-fixing scheme. Moreover, the court found that Motiva and Equilon produced sufficient efficiencies and were sufficiently integrated to constitute indisputably legitimate joint ventures under either the *per se* rule or a "quick look" analysis. Finally, the district court concluded that, because every joint venture "must, at some point, set prices for the products they sell" (citation omitted), a theory which made it illegal for a joint venture to fix prices of its various brands would "act as a per se rule against joint ventures between companies that produce competing products."

## II. Standard of Review

[2][3] We review a district court's grant of summary judgment *de novo*. *United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir.2003). Taking the evidence in the light most favorable to the nonmovant, we must consider whether there are any genuine issues of material fact and whether the district court properly applied the pertinent substantive law. *City of Tacoma*, 332 F.3d at 578; *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th Cir.1996). All inferences must be drawn in favor of the nonmovant. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In antitrust cases, these general standards are applied even more stringently and summary judgments granted more sparingly." *Beltz Travel Service, Inc. v. International Air Transport Ass'n.*, 620 F.2d 1360, 1364 (9th Cir.1980) (citations omitted). As the Supreme Court explained in *Poller v. Columbia Broadcasting Sys. Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962):

[S]ummary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised.

*Id.* at 473, 82 S.Ct. 486.

## III. Standing

The district court found that the plaintiffs lacked standing to sue SRI. The court's decision was based upon two considerations: first, none of the named plaintiffs had ever purchased any products from SRI or from Motiva; and second, the plaintiffs failed to produce sufficient evidence linking SRI to a conspiracy to fix prices in the Western United States. There is no dispute that the plaintiffs never purchased any products from SRI, or from Motiva. Nor is there any doubt that SRI did not sign any of the documents establishing Equilon, did not refine or market gasoline in the Western United States, and had no motive to conspire with Shell and Texaco to fix those brands' prices in the West. Yet the plaintiffs maintain that SRI engaged in a nationwide price-fixing conspiracy with Texaco and Shell through its participation in Motiva, and therefore is liable for all of the acts of each conspiracy member. See *Beltz Travel*, 620 F.2d at 1367; see also Appellants' Brief, at 42.

[4] The plaintiffs rest their theory of standing on the existence of a national *1115 conspiracy-and, in this case, defendants Texaco, Shell, Equilon, and Motiva have admitted that they fixed prices by charging the same price for the Texaco and Shell brands. But the plaintiffs do not establish standing under our precedent simply by showing that SRI was involved to some extent in the planning of certain aspects of the alliance. Rather, "[f]or an agreement to constitute a violation of section 1 of the Sherman Act, a 'conscious commitment to a common scheme designed to achieve an unlawful objective' must be established." *Toscano v. PGA*, 258 F.3d 978, 983 (9th Cir.2001) (quoting *Monsanto Co. v. Spray-Rite*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3872836.1

Case 3:07-cv-04296-MJJ   Document 28-6   Filed 11/01/2007   Page 7 of 16

369 F.3d 1108                                                                                         Page 7
369 F.3d 1108, 2004-1 Trade Cases P 74,432, 04 Cal. Daily Op. Serv. 4680, 2004 Daily Journal D.A.R. 6462
(Cite as: 369 F.3d 1108)

Serv. Corp., 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775, (1984)).

[5] The plaintiffs did proffer evidence showing that Equilon and Motiva were formed as the result of a series of negotiations designed to create a national alliance. Apparently, Shell originally approached the other parties with "ideas about a larger alliance" and explored the possibility of a nationwide alliance. The record contains clear evidence showing that Equilon and Motiva were conceived of as a single strategy to create a national operating structure, separated solely for the sake of efficiency. Moreover, the plaintiffs point to substantial evidence that Equilon and Motiva made pricing decisions together via cooperation through their marketing departments.

Still, the plaintiffs have failed to provide evidence sufficiently implicating SRI in the nationwide price-fixing scheme. The district court found that SRI had "no apparent motive to conspire with Shell and Texaco with respect to Equilon and the Western United States," largely because SRI"would not benefit from any potential anticompetitive effects in Equilon's territory." The plaintiffs have offered no evidence to the contrary. In fact, the record shows unequivocally that SRI's interests were limited to the operation of Motiva and the refining and marketing of gasoline in the Eastern portion of the nation, and that, even there, SRI vigorously protested the domination of the Motiva Board by Shell and Texaco representatives. SRI lamented that the Motiva Board members, who were corporate representatives of Texaco and Shell, and many of whom were also members of the Equilon Board, appeared to be making their decisions for the nationwide "alliance" rather than for the individual joint ventures.[FN6] The record thus demonstrates that-far from engaging in a nationwide conspiracy-SRI had little interest in acceding to the "cooperative" efforts by "common Motiva and Equilon Board members, from Shell and Texaco." In short, the plaintiffs failed to produce evidence that SRI had a "conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto, 465 U.S. at 764, 104 S.Ct. 1464. Although the issue is a close one, we affirm the district court's holding that the plaintiffs failed to establish that SRI participated in the operation of a nationwide *1116 price-fixing alliance or in the fixing of prices in the Western region of the United States.

FN6. One board member who represented SRI in Motiva observed that, "once the Equilon Board takes a position on an issue common to both Motiva and Equilon, Shell and Texaco will have a strong desire to have the same action taken in Motiva." The member further stated:
As is exhibited by Motiva's incorrect reference to the Alliance, rather than Motiva, at the bottom of page 7 and the top of page 8 of the attached Business Plan writeup, the 'focus on Motiva' message will have to be repeated often to get it accepted. The more we allow "Alliance" to dominate, the greater the likelihood that personal behavior will favor "Alliance" over Motiva and the greater the likelihood that sub-optimizations of Motiva, in favor of the Alliance, will occur. We are on alert in this regard but the "Alliance" force is a large one.

### IV. Liability under the Sherman Antitrust Act

[6] "No antitrust violation is more abominated than the agreement to fix prices. With few exceptions, 'price-fixing agreements are unlawful *per se* under the Sherman Act and ... no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense.' The dispositive question generally is not whether any price fixing was justified, but simply whether it occurred." Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133, 1144 (9th Cir.2003) (citations omitted) (alteration in original). The question we confront in this case, however, is not whether two companies engaged in run-of-the-mill price fixing. Instead, the defendants have asked us to find an exception to the *per se* prohibition on price-fixing where two entities have established a joint venture that unifies their production and marketing functions, yet continue to sell their formerly competitive products as distinct brands. In doing so, the companies fixed the prices of those two brands of gasoline, Texaco and Shell, by agreeing *ex ante* to charge the exact same price for each. We think the exception the defendants seek is inconsistent with the Sherman Act as it has been understood to date.

[7] The Sherman Antitrust Act makes illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations[.]" 15 U.S.C. § 1. The Supreme Court has declined to read this language literally. See Nat'l

Case 3:07-cv-04296-MJJ    Document 28-6    Filed 11/01/2007    Page 8 of 16

369 F.3d 1108                                                                                                Page 8
369 F.3d 1108, 2004-1 Trade Cases P 74,432, 04 Cal. Daily Op. Serv. 4680, 2004 Daily Journal D.A.R. 6462
(Cite as: 369 F.3d 1108)

Soc'y of Prof'l Engineers v. United States, 435 U.S. 679, 687, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) (noting that § 1 of the Sherman Act "cannot mean what it says"). Instead, the Court has created a two-tiered mode of analysis.

In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality-they are "illegal *per se.*" In the second category are agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed. In either event, the purpose of the analysis is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of members of an industry. Subject to exceptions defined by statute, that policy decision has been made by the Congress.

Prof'l Engineers, 435 U.S. at 692, 98 S.Ct. 1355. All parties agree that the relevant question in this case is whether the defendants' conduct falls under the first category of analysis.[FN7]

FN7. The plaintiffs have also suggested that if we reject their *per se* approach, we should employ the "quick look" theory of review to find defendants liable. Quick look analysis applies when *per se* review is inapplicable but when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question have an anti-competitive effect on customers and markets." California Dental Ass'n v. Federal Trade Commission, 526 U.S. 756, 770, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999). As the district court rightly noted, "[m]uch like per se treatment, quick-look analysis applies 'when the great likelihood of anticompetitive effects can easily be ascertained.' " (quoting California Dental, 526 U.S. at 770, 119 S.Ct. 1604). Because we hold that the plaintiffs have made a sufficient showing with respect to the illegality of the alliance's price fixing system under the *per se* rule, we need not decide whether that scheme would survive"quick look" review.

*1117 [8] If the plaintiffs can establish that the defendants' conduct falls within the range of conduct considered illegal *per se,* it does not matter whether the particular application of the *per se* rule appears inefficient or unfair. As the Court has explained,

The costs of judging business practices under the rule of reason, however, have been reduced by the recognition of per se rules. Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable. As in every rule of general application, the match between the presumed and the actual is imperfect. For the sake of business certainty and litigation efficiency, we have tolerated the invalidation of some agreements that a fullblown inquiry might have proved to be reasonable.

Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 343-44, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982) (citations omitted).[FN8] The Court has held consistently that the injustice of the rule's broad and uniform application must be addressed to Congress, not the judiciary. See Prof'l Engineers, 435 U.S. at 692, 98 S.Ct. 1355.

FN8. The Maricopa Court noted in a footnote that price fixing is "[a]mong the practices which the courts have heretofore deemed to be unlawful in and of themselves." Id. at 344 n. 15, 102 S.Ct. 2466 (quoting Northern Pac. R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)) (parallel citation omitted).

[9] Price fixing is the quintessential example of a *per se* violation of § 1. Numerous cases support this basic principle. See Fed. Trade Comm'n v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 433, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990) (explaining that there is a *per se* rule against price fixing having the "same force and effect as any other statutory commands"); Nat'l Collegiate Athletic Ass'n v. Bd. of Regents, 468 U.S. 85, 107-08, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) ("Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit.") (citation omitted) (hereinafter: NCAA ); Maricopa County, 457 U.S. at 351, 102 S.Ct. 2466 ("The anticompetitive potential inherent in *all* price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some. Those claims of enhanced competition are so unlikely to prove significant in any particular case that we adhere to the rule of law that is justified in its general application."); Catalano, Inc. v. Target Sales, Inc.,

446 U.S. 643, 647, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980) ("It has long been settled that an agreement to fix prices is unlawful per se. It is no excuse that the prices fixed are themselves reasonable.") (citations omitted); *Prof'l Engineers,* 435 U.S. at 692, 98 S.Ct. 1355 (noting that "[p]rice is the 'central nervous system of the economy' " and holding that "an agreement that 'interferes with the setting of price by free market forces' is illegal on its face") (citation and alteration omitted).

Notwithstanding the above, it is plain that § 1's blanket prohibition on price fixing, like the Act itself, cannot be read literally. *Cf. Prof'l Engineers,* 435 U.S. at 687, 98 S.Ct. 1355 (§ 1 of the Sherman Act "cannot mean what it says"). There are *some* price fixing arrangements that violate the letter of the Sherman Act but are legal nonetheless. For instance, when two competing companies agree to merge and *1118 to combine their product lines, or to eliminate the old product lines and create an entirely new one, they generally agree to adopt a uniform pricing scheme. The Supreme Court has permitted such arrangements. In addition, in *Maricopa County,* the Supreme Court noted in dicta that in joint ventures where "persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit," the ventures are considered, for some purposes at least, to be "single firm[s] competing with other sellers in the market." 457 U.S. at 356, 102 S.Ct. 2466; *see also Broad. Music, Inc. v. Columbia Broad. Sys. Inc.,* 441 U.S. 1, 9, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) ("When two partners set the price of their goods or services they are literally 'price fixing,' but they are not per se in violation of the Sherman Act.") (hereinafter: *BMI* ) (citation omitted).

It is not the case, however, that the mere existence of a bona fide joint venture means that participating companies may use the enterprises to do anything they please with full immunity from *per se* analysis under § 1, including price fixing. As the district court correctly stated when ruling on the motion to dismiss, the issue with respect to legitimate joint ventures is whether the price fixing is "naked" (in which case the restraint is illegal) or "ancillary" (in which case it is not). *Accord* XI HOVENKAMP ¶ 1908, at 228-30 (arguing that "a restraint does not qualify as 'ancillary' merely because it accompanies some other agreement that is itself lawful" and that "a restraint is not saved from the 'naked' classification simply because it is included in some larger joint venture arrangement that is clearly efficient"). For instance, if in reliance on the existence of a valid joint venture between Coca Cola and Pepsi designed to research new types of soda flavors, the two companies imposed a price floor on all soda sold nationwide, the price fixing would constitute an illegal "naked restraint on trade." Along these lines, the Supreme Court has recognized that even joint ventures that are lawful in their general operations may violate the Sherman Act when they engage in specific anticompetitive conduct. *See NCAA,* 468 U.S. at 110, 104 S.Ct. 2948 (holding that an agreement among NCAA schools restricting the broadcasting of football games was an invalid "naked restraint on price and output" but not questioning the validity of the association itself); *BMI,* 441 U.S. at 23, 99 S.Ct. 1551 (holding that joint ventures are not "*usually*" unlawful, at least not ... where the agreement on price is *necessary* to market the product at all") (emphasis added); *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199 (1951) ("The fact that there is common ownership or control of the contracting corporations does not liberate them from the impact of the antitrust laws.... [A]greements between legally separate persons and companies to suppress competition among themselves and others [cannot] be justified by labeling the project a 'joint venture.' ") (citation omitted); *see also* XI HOVENKAMP ¶ 1908, at 228-29 (1998) (noting that the Supreme Court has often condemned joint ventures' price- or output-fixing provisions while leaving "the balance of the joint venture intact").

The defendants' argument to the contrary-that joint ventures such as Equilon and Motiva are incapable of violating the Sherman Act-ignores the lesson of *Citizen Publishing Co. v. United States,* 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969), as well as that of *NCAA, BMI,* and *Timken.* In *Citizen Publishing,* the Supreme Court confronted a joint venture similar to the one between Equilon and Motiva. The defendants in that case were the two daily newspapers in Tucson, Arizona.*1119 They entered into a joint venture agreement, which "provided that each paper should retain its own news and editorial departments, as well as its corporate identity." 394 U.S. at 133, 89 S.Ct. 927. The joint venture established a new company, Tucson Newspapers, Inc.,"which was to manage all departments of their business except the news and editorial units. The production and distribution equipment of each paper was transferred to TNI." *Id.* at 133-34, 89 S.Ct. 927. The purpose of the agreement, like the purpose of the Alliance, was "to end any business or commercial competition between the two papers." *Id.* at 134, 89 S.Ct. 927.[FN9]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3872836.1

Case 3:07-cv-04296-MJJ   Document 28-6   Filed 11/01/2007   Page 10 of 16

369 F.3d 1108                                                                                                           Page 10
369 F.3d 1108, 2004-1 Trade Cases P 74,432, 04 Cal. Daily Op. Serv. 4680, 2004 Daily Journal D.A.R. 6462
(Cite as: 369 F.3d 1108)

> FN9. Also similar to the agreements forming Equilon and Motiva, the *Citizen Publishing* agreement imposed several anticompetitive controls: first, the joint venture consolidated pricing and set joint subscription and advertising rates; second, the venture pooled all profits and losses pursuant "to an agreed ratio"; and third, the two parent corporations agreed not to compete against each other or the joint venture in the relevant market areas. *Id.*

The Supreme Court held that the confluence of these anticompetitive restraints, in the context of a joint venture between two formerly-vigorous competitors in the market area targeted by the venture, constituted a *per se* violation of the Sherman Act.

The § 1 violations are plain beyond peradventure. Price-fixing is illegal per se. Pooling of profits pursuant to an inflexible ratio at least reduces incentives to compete for circulation and advertising revenues and runs afoul of the Sherman Act. The agreement not to engage in any other publishing business in Pima County was a division of fields also banned by the Act. The joint operating agreement exposed the restraints so clearly and unambiguously as to justify the rather rare use of a summary judgment in the antitrust field.

*Id.* at 135, 89 S.Ct. 927 (internal citations omitted). Cases like *Maricopa County* and *BMI* do seem to suggest that the Court, if confronted with a similar joint venture today, might not find the enterprise as a whole unlawful. The Court has, however, continued to enforce the Sherman Act's *per se* prohibition on price fixing, and has scrutinized joint ventures to ensure that they do not contain "naked" restraints on trade. *See, e.g., NCAA,* 468 U.S. at 109, 104 S.Ct. 2948. Nothing in the cases suggests that the Court would overrule *Citizen Publishing* in its entirety, abandon its holding that the price fixing in which the joint venture engaged was illegal *per se,* or eliminate the rule that "naked" price-fixing by a joint venture violates the Sherman Act.

The district court distinguished *Citizen Publishing* in three ways. Each is unsatisfactory. First, the court found that the Tucson newspapers in *Citizen Publishing* effectively eliminated "all competition," whereas Equilon and Motiva "continue to compete with several major oil companies in their relevant markets." This distinction runs contrary to Supreme Court precedent. *See Fed. Trade Comm'n,* 493 U.S. at 434, 436, 110 S.Ct. 768 (noting that even "a small conspirator may be able to impede competition" and holding that "[c]onspirators need not achieve the dimensions of a monopoly, or even a degree of market power any greater than that already disclosed by this record, to warrant condemnation under the antitrust laws").[FN10]

> FN10. *See also NCAA,* 468 U.S. at 109-10, 104 S.Ct. 2948 ("As a matter of law, the absence of proof of market power does not justify a naked restraint on price or output.... This naked restraint on price and output requires some competitive justification even in the absence of a detailed market analysis.").

*1120 Second, the district court found that the *Citizen Publishing* newspapers "combined for the specific purpose of *restricting competition and fixing prices,*" in contrast to a complete lack of evidence establishing such intent for the alliance ventures. That distinction, if true, would speak only to the validity of Equilon and Motiva as a whole-it would not justify the defendants' adoption of a price fixing scheme. Moreover, the court's finding was contrary to its obligation to accept the version of disputed facts most favorable to the plaintiffs. Several of the defendants' witnesses admitted during depositions that the decision to unify the pricing of the Texaco and Shell brands was made contemporaneously with the formation of the alliance, but before the actual joint ventures officially existed, and that the very purpose of the alliance was to eliminate competition in order to realize efficiency gains and gain market share.[FN11] The plaintiffs created a sufficient issue of material fact as to whether the intended purpose of the unified pricing scheme was to restrict competition.

> FN11. Thus, contrary to our dissenting colleague's understanding, the pricing decision was not made by a single economic entity. *See Post,* at 1126, *id.* at 1127 ("[N]othing more radical is afoot than the fact that an entity, which now owns all of the production, transportation, research, storage, sales and distribution facilities for engaging in the gasoline business, also prices its own products. It decided to price them the same, as any other entity could."). At this stage of the litigation, we are required to draw all reasonable inferences in

Case 3:07-cv-04296-MJJ    Document 28-6    Filed 11/01/2007    Page 11 of 16

369 F.3d 1108                                                                                                                                          Page 11
369 F.3d 1108, 2004-1 Trade Cases P 74,432, 04 Cal. Daily Op. Serv. 4680, 2004 Daily Journal D.A.R. 6462
(Cite as: 369 F.3d 1108)

favor of the plaintiffs. Viewing the evidence in that light, there is at least a triable issue of fact as to whether Texaco and Shell agreed in advance to charge the same price for their two distinct gasoline brands as an initial operating requirement of the alliance. The decision by Texaco and Shell to include in their joint ventures a unified pricing scheme was not a decision made by a single economic entity-it was a decision made by competitors. Whether the agreement constituted "a conspiracy [ ] in restraint of trade," 15 U.S.C. § 1, or whether such a conspiracy would exist regardless of when the decision to engage in unified pricing was made, is for the district court to determine on remand.

Third, the district court believed that the only reason the non-competition agreement in *Citizen Publishing* was unlawful was because the agreement joined the only two competitors in the market. The Western oil market, by contrast, is a diverse market with "several competitors," while the Equilon joint venture has a much narrower non-competion agreement. This distinction returns to an analysis of market power, an analysis which the Supreme Court has held is inappropriate in this type of case. *See Federal Trade Comm'n*, 493 U.S. at 434-35, 110 S.Ct. 768; *NCAA*, 468 U.S. at 110, 104 S.Ct. 2948 ("We have never required proof of market power in such a case."). Moreover, the record shows both that Equilon exercised a substantial amount of control over the Western gasoline market, and that the two joint ventures helped divide the gasoline consumer field by jointly promoting and targeting the Texaco and Shell brands to better capture their relevant markets. None of the district court's distinctions is sufficient to justify ignoring *Citizen Publishing* and that decision's condemnation of price fixing by former competitors even when adopted as part of a joint venture arrangement.

[10] In granting the defendants' summary judgment motion, the district court ruled that "a reasonable trier of fact could not find that the Defendants formed Equilon and Motiva merely to achieve an ulterior anticompetitive purpose or that the ventures are patently anticompetitive." [FN12] *1121 Even were that true, the district court stopped short of completing the requisite inquiry. The proper inquiry for a *per se* analysis of price fixing is not simply whether the joint venture itself is anticompetitive. Nor is the relevant question simply whether the defendants intended to destroy competition. *See Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1153-54 (9th Cir.2003) (holding that evidence of an intent to destroy competition or engage in predatory price controls is not essential to demonstrating the existence of an illegal agreement). Rather, if the answer to those questions is in the negative, we must then decide whether the defendants' conduct-setting one, unified price for both the Texaco and Shell brands of gasoline instead of setting each brand's price independently on the basis of normal market factors [FN13]-is reasonably necessary to further the legitimate aims of the joint venture. *See Freeman*, 322 F.3d at 1151 (holding that plainly anticompetitive conduct by otherwise valid joint ventures must be "reasonably ancillary to the legitimate cooperative aspects of the venture") (citation omitted).

FN12. The district court asked whether "Equilon and Motiva are either mere window-dressings for a price fixing conspiracy or ... are otherwise patently anticompetitive."

FN13. We assume that normal market factors would include the cost of production and marketing, supply, demand, and the like.

The Supreme Court has upheld joint ventures and other corporate combinations involving fixed prices, but generally has done so only when it appeared plain to the Court that the restraints undertaken by the joint ventures were "necessary" to the legitimate aims of the joint venture. *See BMI*, 441 U.S. at 23, 99 S.Ct. 1551 (approving an otherwise invalid price restraint only because "the agreement on price is necessary to market the product at all"); *NCAA*, 468 U.S. at 117, 104 S.Ct. 2948 ("Our decision not to apply a per se rule to this case rests in large part on our recognition that a certain degree of cooperation is necessary if the type of competition that petitioner and its member institutions seek to market is to be preserved."); *id.* at 101, 104 S.Ct. 2948 ("what is critical is that this case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all"); *accord* XI HOVENKAMP ¶ 1908, at 236 ("Joint sales endeavors may require joint price setting, particularly when the jointly produced product, such as the 'blanket' license in *BMI*, is something individual participants could not produce at all."). Courts have engaged in this "essentiality query," *id.* at 228, in order to ensure that a joint venture has a legitimate justification-other than the desire to enhance profits and market control-

Case 3:07-cv-04296-MJJ   Document 28-6   Filed 11/01/2007   Page 12 of 16

369 F.3d 1108                                                                                                    Page 12
369 F.3d 1108, 2004-1 Trade Cases P 74,432, 04 Cal. Daily Op. Serv. 4680, 2004 Daily Journal D.A.R. 6462
(Cite as: 369 F.3d 1108)

for adopting a particular restraint that would otherwise violate the Sherman Act. Thus, whether the *per se* rule applies to a legitimate joint venture's allegedly anticompetitive conduct depends first and foremost on a determination of whether the specific restraint is sufficiently important to attaining the lawful objectives of the joint venture that the anti-competitive effects should be disregarded.[FN14]

> FN14. As one commentator has explained,
> Once a court finds the joint venture proper, it can easily determine the appropriateness of any related competitive restraints among the parties to the venture. A court should simply consider whether such restraints are necessary to promote the venture's procompetitive purposes. If a joint venture itself is procompetitive, the courts should uphold any restrictions on competition necessary to achieve its legitimate purposes.... The defendant should have the burden of proving that a competitive restraint is required to further a venture's efficiency objectives. If a defendant fails to meet this burden, a court should preclude the restraint without any further inquiry.
> Thomas A. Piraino, Jr., *A Proposed Antitrust Approach to Collaborations Among Competitors,* 86 Iowa L.Rev. 1137, 1188-89 (2001).

*1122 In considering the relationship of the enterprise's pricing actions to the venture's legitimate objectives, we find it significant that the defendants here did not simply consolidate the pricing decisions within the joint ventures-they *unified* the pricing of the two brands from the time the alliance was formed by designating one individual in each joint venture to set a single price for both brands.[FN15] Normally, a business determines the prices it will charge for its various products by considering numerous factors, just a few of which include the costs of production and marketing and the contours of the relevant product markets. In this case, the defendants have stressed that, in addition to the differences in the product themselves, the gasolines marketed under the Texaco and Shell labels have different reputations and consumer bases. It thus seems likely that independent price analyses would result, at least in some circumstances, in the rational decision to sell the different brands at different prices. Instead, the defendants chose to fix those prices uniformly.

> FN15. As stated earlier, this single price was subject to variations depending upon geographic markets, such that the price of the Texaco and Shell brands might be higher in San Diego, California than it was in Lincoln, Nebraska. The two brands, however, were always priced together in each geographic market-the price never varied as between the two.

The defendants have thus far failed to offer any explanation of how their unified pricing of the distinct Texaco and Shell brands of gasoline served to further the ventures' legitimate efforts to produce better products or capitalize on efficiencies. Nor does the record contain facts sufficient to warrant our drawing any such inference. To the contrary, the record before us reveals that the alliance never considered unified pricing to be relevant to product improvement or efficiency gains. As one oil company executive explained, all of the anticipated cost savings, which were calculated prior to formation of the joint ventures, had "nothing to do with pricing." The absence of persuasive evidence showing a procompetitive justification for initiating the price-fixing scheme, when viewed along with the plaintiffs' evidence showing anticompetitive effects, convinces us that the plaintiffs have made a sufficient showing as to the applicability of the *per se* rule.[FN16]

> FN16. Indeed, the record is close to establishing that the price-fixing scheme was sufficiently unrelated to accomplishing the legitimate objectives of the joint venture as to justify granting the plaintiffs' motion for summary judgment. However, given the complexity of the economic arrangements at issue, the sparseness of the record, the district court's failure to apply the appropriate test, and our general presumption against granting summary judgment in such cases, we conclude that the denial of both sides' motion for summary judgment is appropriate here.

[11] The defendants offer only two justifications for the unitary pricing scheme. First, the defendants argue-as does our dissenting colleague-that, as a general rule, any bona fide joint venture must be able to set prices for its products at whatever level it chooses: "without the ability to price its products, neither venture would have had the authority to make fundamental decisions affecting its financial performance." Appellees' Brief, at 16. Second, the

Case 3:07-cv-04296-MJJ    Document 28-6    Filed 11/01/2007    Page 13 of 16

369 F.3d 1108                                                                                                    Page 13
369 F.3d 1108, 2004-1 Trade Cases P 74,432, 04 Cal. Daily Op. Serv. 4680, 2004 Daily Journal D.A.R. 6462
(Cite as: 369 F.3d 1108)

defendants argue that Equilon and Motiva fixed uniform Texaco and Shell prices in order to "prevent issues of price discrimination from arising under the Robinson Patman Act[.]"*Id.* We address the latter justification first.

A cursory examination of the Robinson-Patman Act, 15 U.S.C. § 13,[FN17] which was *1123 designed to prevent sellers from engaging in price discrimination, reveals its inapplicability here. Under Robinson Patman, sellers may not sell the same product at different prices on the basis of the identity of the buyer.[FN18] But in adopting the Act, "Congress did not intend to outlaw price differences that result from or further the forces of competition." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 220, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993).* Robinson Patman was aimed at evils entirely absent here. As another Circuit has explained,

> FN17. The Act provides that "[i]t shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality[.]" 15 U.S.C. § 13(a).

> FN18. The Act explicitly excludes price differentials "which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered[.]" 15 U.S.C. § 13(a).

The [Act] was ... motivated by concerns for small, independent distributors, which in the 1930's were threatened by the arrival of chain stores. It marked "the high-water mark of the anti-chain-store movement." Although the Clayton Act had prohibited certain price discriminations, it was seen as ineffective in stopping the discriminatory prices granted chain stores by virtue of their size. So far as purchasing was concerned, this discrimination put the more normal "mom and pop" merchants of the day at a competitive disadvantage. Congress [enacted Robinson-Patman] to alleviate the disadvantage by putting the new age retailing behemoths on a level "playing-field" with small independent merchants and businessmen....
As is obvious from this brief summary of the RPA's history, "it is fairness, as Congress perceives it, that Robinson Patman is all about." The Act's goal is to abolish unwarranted favoritism among all functional competitors, big or small. Its objective is to assure "that businessmen at the same functional level start on equal competitive footing so far as price is concerned"; "to assure that all sellers regardless of size, competing directly for the same customers ... receive evenhanded treatment from their suppliers"....

*Alan's of Atlanta, Inc. v. Minolta Corp., 903 F.2d 1414, 1422 (11th Cir.1990)* (internal citations, alterations, and footnote omitted).

The quoted passage makes it clear that the defendants' Robinson Patman argument is wholly without merit. The Act would unquestionably be inapplicable to a decision by the defendants to sell the distinct Texaco and Shell brands of gasoline at different prices. Any such decision would necessarily be predicated on the differences between the two brands, not upon the identity of the buyers. The record shows that the alliance never intended to market or sell the two brands as the same product. Rather, it went to great lengths to differentiate carefully between the brands. Mostly, this took place at the additive stage-where generic "fungible" gasoline is transformed into a specific brand. But it also took place at the marketing stage, where the Texaco and Shell brands of gasoline were always targeted at different groups of consumers. The defendants cite no precedent or provision of statutory law that would support applying Robinson Patman to a decision to use different prices for distinct, though similar, products. Finally, this Circuit has rejected "the argument relying on the 'underlying notion of fairness of offering the same services at the same prices to all participants.' The 'fairness' of uniform pricing is not a relevant consideration in an antitrust *1124 case; consumers are presumed to prefer lower prices to the satisfaction of knowing they paid the same inflated price as everyone else." *Freeman, 322 F.3d at 1151.*

The first of the defendants' two arguments-that a joint venture must be able to set whatever price it chooses for its products-proves too much. If that were true, any number of companies could create joint ventures as fronts for price-fixing. The simple answer is that the Supreme Court has declined to immunize joint ventures from *per se* antitrust scrutiny. *See NCAA, 468 U.S. at 109, 104 S.Ct. 2948; BMI, 441 U.S. at 23, 99 S.Ct. 1551; Citizen Publishing, 394 U.S. at 135, 89 S.Ct. 927; Timken, 341 U.S. at 598, 71 S.Ct. 971.* We too have rejected the plaintiffs' proposed rule. *See Freeman, 322 F.3d at 1148* (holding that the fact that joint ventures "pursue the common

Case 3:07-cv-04296-MJJ   Document 28-6   Filed 11/01/2007   Page 14 of 16

369 F.3d 1108                                                                                                                  Page 14
369 F.3d 1108, 2004-1 Trade Cases P 74,432, 04 Cal. Daily Op. Serv. 4680, 2004 Daily Journal D.A.R. 6462
(Cite as: 369 F.3d 1108)

interests of the whole" does not necessarily immunize them from antitrust scrutiny and noting that "cases finding joint ventures to be incapable of conspiracy are the 'exception' "). The leading treatise in the field has also expressed similar disapproval of the defendants' claim. See XI HOVENKAMP ¶ 1908, at 229 ("Such a rule could protect cartels from the heightened scrutiny attending naked restraints through the simple device of attaching the cartel agreement to some other, independently lawful transaction.").

[12] Finally, the defendants claim-as does our dissenting colleague-that an application of the per se rule here would mean that joint ventures could not set prices for their products. We reject this argument. We of course recognize that joint ventures may price their products; that is not the question. The question is whether two former (and potentially future) competitors may create a joint venture in which they unify the pricing, and thereby fix the prices, of two of their distinct product brands. We have held that the Sherman Act's per se rule applies when the defendant fails to demonstrate a sufficient relationship between the price fixing scheme and furthering the legitimate aims of the joint venture-a relationship that justifies the otherwise prohibited price restraints. Thus far in this litigation, the defendants have failed to produce sufficient evidence demonstrating that their price fixing scheme was ancillary rather than naked and, thus, that they are entitled to summary judgment.

The result we reach here allows joint ventures to set prices for their products within the limits of the Sherman Act. Our analysis would be different if we confronted a joint venture in which former competitors agreed jointly to research, produce, market, and sell a new product, or a joint venture in which competitors agreed to merge their current product lines into one collective brand. Nor would we necessarily reach the same result if the defendants had independently decided to charge the same price for Texaco and Shell gasoline after conducting separate price analyses for each brand, or had they come forward with persuasive evidence that the setting of a single, fixed price was important to accomplishing the legitimate aims of the joint ventures.

We do not share the defendants' concern that validating the application of the per se rule to the pricing decisions of joint ventures will risk invalidating countless economically efficient business integrations. The plaintiffs have come forward with sufficient evidence to create a triable issue of fact as to whether the defendants engaged in a naked restraint on trade, prohibited per se by the Sherman Act. Whether the defendants will be found liable at trial remains to be seen. But if they are, and if that individual application of the per se rule is economically inefficient, that concern*1125 must be addressed to Congress, not the judiciary. See Maricopa County, 457 U.S. at 354-55, 102 S.Ct. 2466; Professional Engineers, 435 U.S. at 692, 98 S.Ct. 1355.[FN19]

FN19. Congress's response to Citizen Publishing further convinces us that we should not carve out an exception to the Sherman Act simply because the type of venture at issue here may be economically efficient. Shortly after the decision, Congress passed the Newspaper Preservation Act, 15 U.S.C. §§ 1801-1804, which specifically exempted from the Sherman Act newspaper operating arrangements like the one in Citizen Publishing. See Hawaii Newspaper Agency v. Bronster, 103 F.3d 742, 744-45 (9th. Cir.1996). After surveying the relevant "economic conditions," Congress determined that the specific type of joint venture at issue was beneficial and even necessary in a "large majority of American communities." H.R.Rep. No. 91-1193, 91st Cong., 2d Sess. (1970), reprinted in 1970 U.S.C.C.A.N. 3547, 3548. Those economic conditions, in Congress's view, justified more lenient antitrust review of newspaper industry joint ventures than the Court had applied in Citizen Publishing. Congress has made no such findings, nor has it passed any similar law, relevant to the oil and gasoline industry, which certainly is not without its supporters in the Legislative and Executive Branch. If Congress wishes to exempt oil and gasoline enterprises from the Sherman Act's per se prohibition of price fixing, it may certainly do so, but it is beyond our authority to read new exceptions into the Act.

We therefore hold that the district court erred in finding no triable issue of fact with respect to the plaintiffs' per se claim. The plaintiffs have presented sufficient evidence to create a triable issue of fact as to whether the alliance's unified pricing scheme was a per se violation of § 1 of the Sherman Act.

Case 3:07-cv-04296-MJJ    Document 28-6    Filed 11/01/2007    Page 15 of 16

369 F.3d 1108                                                                                                      Page 15
369 F.3d 1108, 2004-1 Trade Cases P 74,432, 04 Cal. Daily Op. Serv. 4680, 2004 Daily Journal D.A.R. 6462
(Cite as: 369 F.3d 1108)

For the reasons stated above, we AFFIRM the district court's award of summary judgment to defendant Saudi Refining, Inc., REVERSE the district court's award of summary judgment against the Plaintiffs Appellants, and REMAND for further proceedings consistent with this opinion.

FERNANDEZ, Circuit Judge, Concurring and Dissenting:

I agree that the plaintiffs lacked standing as to SRI and, therefore, concur in the result of part III of the majority opinion. However, I dissent from part IV.

While this case does involve a very complicated set of transactions, it presents a rather straightforward antitrust law question. That is, where former competitors create a bona fide joint venture to which all of their assets and operations in segments of their businesses are contributed, will there be a *per se* violation of the antitrust laws, if the joint venture entity sets the prices of the goods it sells? I think the answer is no.

Here, Shell and Texaco formed Equilon Enterprises, LLC in the western United States, and Motiva Enterprises, LLC in the eastern United States.[FN1] There can be no doubt that each of the new entities is a true, bona fide, economically integrated joint venture. Refineries, lubricant plants, research laboratories, thousands of service stations, thousands of miles of pipeline, thousands of employees, and over 100 terminals were contributed to the ventures. Upon those transfers, Shell and Texaco ceased refining and marketing operations in both the western and the eastern United States. They were no longer in those businesses within the United States; the joint ventures were.[FN2] In other words, *1126 Equilon now manufactured, inventoried, transported, and marketed the products. It ran the refinery; it had the research facilities; it transported products; and it dealt with the station operators and other buyers. It also priced the products, and set the same price for *its* Shell and Texaco brands.

FN1. Henceforth, I shall only refer to Equilon because it is the entity that directly affects plaintiffs in this case-Independent Operators.

FN2. We have previously had occasion to describe the nature of Equilon. See Abraham & Sons Enters. v. Equilon Enters., LLC, 292 F.3d 958, 960 (9th Cir.2002). As we stated, an LLC is an entity truly distinct from its members and its acts "are deemed independent of the acts of its members." Id. at 962. It is a separate juridical person. Id. LLCs are much like corporations, and, though controlled by their members,"LLCs remain separate and distinct from their members." Id.

While Independent Operators do not assert that the placing of the whole manufacturing, transport and marketing functions in a single entity violated 15 U.S.C. § 1, they do assert that having the pricing function in Equilon did violate the antitrust laws *per se*. The majority thinks that might be true; I do not.

It is plain enough that the mere creation of a joint venture is not a *per se* antitrust violation. No doubt, like mergers, joint ventures are combinations of business assets but "such combinations are judged under a rule of reason" analysis. Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984). Especially should that be true of the LLC type of venture, which is not only a separate entity, but which also functions as a separate economic unit for all practical purposes. See Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1053 (9th Cir.1983). In fact, to slightly paraphrase the Supreme Court statement in Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 356, 102 S.Ct. 2466, 2479, 73 L.Ed.2d 48 (1982):

[Equilon is] ... analogous to partnerships or other joint arrangements in which persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit. In such joint ventures, the partnership is regarded as a single firm competing with other sellers in the market.

Nor does the mere fact that Equilon sets prices for the products it manufactures and sells suffice to demonstrate that its actions were price fixing for antitrust purposes. See Broad. Music, Inc., v. Columbia Broad. Sys., Inc., 441 U.S. 1, 8-9, 99 S.Ct. 1551, 1556-57, 60 L.Ed.2d 1 (1979). Rather, "[l]iteralness is overly simplistic and often overbroad. When two partners set the price of their goods or services they are literally 'price fixing,' but they are not *per se* in violation of the Sherman Act."Id. at 9, 99 S.Ct. at 1557. So just what could make the operation of Equilon a *per se* violation of the antitrust laws? Surely it is not a claim that the venture is a

Case 3:07-cv-04296-MJJ   Document 28-6   Filed 11/01/2007   Page 16 of 16

369 F.3d 1108                                                                                          Page 16
369 F.3d 1108, 2004-1 Trade Cases P 74,432, 04 Cal. Daily Op. Serv. 4680, 2004 Daily Journal D.A.R. 6462
(Cite as: 369 F.3d 1108)

sham. *See Addamax Corp. v. Open Software Found., Inc.,* 152 F.3d 48, 52 (1st Cir.1998). No one seriously asserts *that.*

Nor can it be that this is a case like *Citizen Publ'g Co. v. United States,* 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969). There, two newspapers formed a third corporation for the principal purpose of eliminating competition, but each remained in the same business in the same area, and retained the production of the true product-news and editorials-in its own hands. *Id.* at 133, 89 S.Ct. at 928. Moreover, the newspapers themselves-not the new entity-jointly set the subscription and advertising rates. *Id.* at 134, 89 S.Ct. at 928. None of that is true here. Equilon owned all of the assets, all of the obligations, and, in a word, the whole business. It set the prices. It was a separate entity; a fact that the Independent Operators seem unable or unwilling to grasp.

**\*1127** But, Independent Operators argue, in this case the fixing of prices by the venture is neither essential nor "reasonably ancillary to the legitimate cooperative aspects of the venture." *Freeman v. San Diego Ass'n of Realtors,* 322 F.3d 1133, 1151 (9th Cir.2003). The majority agrees; I cannot understand why. The situation here is far from the kind of situation we faced in *Freeman.* There, the reason for the venture was the unifying of disparate multiple listing databases. *Id.* at 1140-41. That done, there was a new database entity, and the corporations that formed it for that purpose went on operating their own businesses. But they all also agreed to fix a price for support services. That was essentially unrelated to the database itself, and was unnecessary, and unjustified. *Id.* at 1151. It was the latter "price fix" that ran afoul of antitrust principles. Here we have nothing of the kind.

In this case, nothing more radical is afoot than the fact that an entity, which now owns all of the production, transportation, research, storage, sales and distribution facilities for engaging in the gasoline business, also prices its own products. It decided to price them the same, as any other entity could. What could be more integral to the running of a business than setting a price for its goods and services? I am at a loss for an answer to that question, and nothing written about this case to date imparts additional wisdom or better information.

Yet Independent Operators insist that the setting of the prices is a violation. That is, separate juridical business entity though it is, Equilon can really only be the semblance of a true business, for if it, like any other economic actor, desires to price its own goods, its members may well be subject not merely to commination, but to outright denunciation by the courts as *per se* violators of the antitrust laws. It means that this entity must ask a separate juridical entity-for example, Shell, which does not itself own any of the facilities or products-to decide what price should be charged by Equilon.[FN3] Again, the majority thinks that might be so; I do not.

> FN3. Shell, by the way, is a mere member of Equilon and is shielded from liability for the debts or obligations of Equilon, just as corporate shareholders are shielded. *See* Cal. Corp.Code § 17101.

We now have an exotic beast, no less strange than a manticore, roaming the business world. This beast would otherwise be a true business, but when it acts like a true business-sets prices for its own goods-it subjects its otherwise insulated members to the severe sting of antitrust liability. While it has the head of a business man and the body of an entrepreneurial lion, it has the tail of a liability scorpion. I suppose I am as taken with stories of exotic beasts as the next person, but I prefer to leave them in the realm of the unknown; I would rather not confront them in the marketplace.

In short, I do not believe that the Independent Operators have pointed to a *per se* antitrust violation,[FN4] and they do not even attempt to assert a full rule of reason claim.

> FN4. Similarly, no "quick look" violation is shown. *See Cal. Dental Ass'n v. FTC,* 526 U.S. 756, 770, 119 S.Ct. 1604, 1612, 143 L.Ed.2d 935 (1999); *Bogan v. Hodgkins,* 166 F.3d 509, 514 n. 6 (2d Cir.1999).

Thus, I respectfully dissent as to part IV of the majority opinion.

C.A.9 (Cal.),2004.
Dagher v. Saudi Refining, Inc.
369 F.3d 1108, 2004-1 Trade Cases P 74,432, 04 Cal. Daily Op. Serv. 4680, 2004 Daily Journal D.A.R. 6462

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3872836.1